**Alton J. LEMON et al.**

v.

**Grace SLOAN, State Treasurer of the Commonwealth of Pennsylvania.**

**Jose Diaz and Enilda Diaz, his wife, et al., Interveners.**

**Civ. A. No. 71-2223.**

United States District Court,
E. D. Pennsylvania.

April 6, 1972.

Theodore R. Mann, Philadelphia, Pa., Leo Pfeffer, New York City, for plaintiffs.

J. Shane Creamer, Atty. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Harrisburg, Pa., for defendant Sloan.

William B. Ball, Harrisburg, Pa., for defendant interveners Diaz and Watson.

Joseph G. Skelly, Harrisburg, Pa., for defendant interveners Zimmerspitz and Harvey.

James E. Gallagher, Jr., Philadelphia, Pa., for defendant intervener, Powell.

C. Clark Hodgson, Jr., Philadelphia, Pa., for defendant intervener Kretzmann.

Henry T. Reath, Robert L. Pratter, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant intervener Crouter and for Pennsylvania Ass'n. of Independent Schools, amicus curiae in support of defendants.

John D. Killian, Harrisburg, Pa., for Pennsylvania Council of Churches, amicus curiae in support of plaintiffs.

Thomas B. Harvey, Jr., Philadelphia, Pa., for American Civil Liberties Foundation of Pa., amicus curiae in support of plaintiffs.

Joseph B. Meranze, Harvey B. Levin, Philadelphia, Pa., for Pennsylvania Jewish Community Relations Conference, amicus curiae in support of plaintiffs.

John M. Elliott, Edward F. Mannino, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for Benjamin Banneker Urban Center, amicus curiae in support of defendants.

James L. J. Pie, Philadelphia, Pa., for Pennsylvania Federation Citizens for Educational Freedom, amicus curiae in support of defendants.

Before HASTIE, Senior Circuit Judge, JOSEPH S. LORD, III, Chief District Judge, and HANNUM, District Judge.

## OPINION

JOSEPH S. LORD, III, Chief District Judge.

Plaintiffs brought this suit to declare the Pennsylvania Parent Reimbursement Act for Nonpublic Education [1] (the "Act") unconstitutional and to enjoin its operation. The Act is challenged as violative of the Establishment and Free Exercise Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. This court has jurisdiction of the controversy pursuant to 28 U.S.C. §§ 1331, 1343(3), 2281 and 2284. Presently before the court are motions of defendant and intervening defendants to dismiss the complaint for lack of standing and failure to state a claim upon which relief can be granted.

The plaintiffs are citizens, residents and taxpayers of the Commonwealth of Pennsylvania who have paid the Pennsylvania cigarette tax which finances the Act. Plaintiff Lemon is also the parent of a Negro child attending a public school in Pennsylvania. Defendant Sloan is State Treasurer of the Commonwealth of Pennsylvania and is sued in that capacity. Intervening defendants are citizens, residents and taxpayers of the Commonwealth of Pennsylvania. Interveners are parents of one or more students who are enrolled in nonpublic schools in Pennsylvania and interveners are eligible for tuition reimbursement payments under the Act.

The Act provides for the reimbursement of tuition payments to parents whose children have completed the school year in a nonpublic school located in Pennsylvania which fulfills the compulsory school attendance requirements under Pennsylvania law and the requirements of Title VI of the Civil Rights Act of 1964.[2] In its legislative findings and

---

1. Act 92 of the Pennsylvania General Assembly, August 27, 1971. Appendix A, *infra*.

2. Title VI prohibits discrimination on the ground of race, color, or national origin in programs receiving federal financial assistance. 42 U.S.C. § 2000d et seq.

declaration of policy, the Pennsylvania General Assembly determined that parents who send their children to nonpublic schools assist the state in reducing the rising cost of public education. The General Assembly found that if inflation and rising costs of education force parents of children now enrolled in nonpublic schools to transfer a substantial number of their children to public schools, "an enormous added financial, educational and administrative burden would be placed upon the public schools and upon the taxpayers of the state."[3] Therefore, in order to insure that parents can continue to aid the state by sending their children to nonpublic schools and in order to foster educational opportunity for all children, the General Assembly established the tuition reimbursement program.

[1] The first ground of defendants' motion to dismiss is that the complaint fails to state a claim under the Establishment Clause of the First Amendment upon which relief can be granted.[4] Plaintiffs allege that the Act authorizes payment for the tuition of students in educational institutions which

" * * * (1) are controlled by churches or religious organizations, (2) have as their purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums [sic] and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at or participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, or (10) impose religious restrictions on what the faculty may teach."

¶ 10 Complaint.[5]

For the purpose of considering the motion to dismiss, we must accept these allegations as true. Therefore, the issue before us is whether the Establishment Clause prohibits the state from reimbursing parents for the tuition costs of sending their children to church-related elementary and secondary schools.

The Establishment Clause was intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity."

---

3. Section 2(4), Act 92, Appendix A.

4. Defendants concede and we find that plaintiffs have standing to sue under the Establishment Clause. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

5. Defendant intervener Crouter has moved under F.R.Civ.P. 12(f) to strike paragraph 10 of plaintiff's complaint as immaterial and as requiring inquiry into the religious practices and character of schools to which parents choose to send their children in violation of the parents' rights of free exercise of religion, privacy, and freedom of expression.

F.R.Civ.P. 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Defendant maintains that the allegations of paragraph 10 concerning the religious character of nonpublic schools are constitutionally irrelevant because the Act does not give aid to schools, but to parents. However, the issue of whether the Act aids religious schools or aids parents to provide a religious education for their children is one of the issues in dispute in this litigation, and the allegations of paragraph 10 are certainly relevant to the plaintiffs' claims.

" * * * The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." Brown and Williamson Tobacco Corp. v. U. S., 201 F.2d 819, 822 (C.A.6, 1953). See also Augustus v. Bd. of Public Instruction, 306 F.2d 862, 868 (C.A.5, 1962), 2A J. Moore, Federal Practice ¶ 12.21 [2] (2d ed. 1968).

Defendant's further objection concerning the constitutionality of inquiring into the religious character of the schools is premature and should be raised once such information is actually sought. We therefore deny defendant intervener's motion to strike paragraph 10.

**1360**

Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). *See also* Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

"Every analysis must begin with the candid acknowledgment that there is no single constitutional caliper which can be used to measure the precise degree to which these three factors are present or absent. Instead, our analysis in this area must begin with a consideration of the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause." Tilton v. Richardson, 403 U.S. 672, 677–678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790, 798 (1971).

In Lemon v. Kurtzman, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971), the Supreme Court restated the three tests it has developed for determining whether a particular program offends the Establishment Clause.

" * * * First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060, 1065 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' Walz, *supra*, at 674, 90 S.Ct. at 1414, 25 L.Ed.2d at 704."

The stated legislative purpose of the Act is to aid parents to continue to send their children to nonpublic schools thereby fostering educational opportunities for both public and nonpublic school children. The legislative findings and declaration of policy indicate that the General Assembly is concerned with maintaining the present standards of public education which it finds would be seriously jeopardized if parents of nonpublic school children could no longer afford tuition costs and were forced to send their children to public schools. "A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate." Lemon, *supra*, 403 U.S. at 613, 91 S.Ct. at 2111. Therefore, according the stated legislative intent appropriate deference, we conclude that the Act expresses a legitimate secular objective consistent with the Establishment Clause. *See* Allen, *supra*, 392 U.S. at 243, 88 S.Ct. at 1926; Lemon, *supra*, 403 U.S. at 613, 91 S.Ct. at 2111; Tilton, *supra*, 403 U.S. at 678–679, 91 S.Ct. at 2096.

We must next determine whether the Act has the primary effect of advancing religion. The very existence of this "test" reflects the Court's determination that there may be some forms of aid to church-related activities which do not involve that sponsorship, financial support or the active involvement of the state in religious activity which the Establishment Clause was intended to prevent. Although the Court "can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication," Tilton, *supra*, 403 U.S. at 678, 91 S.Ct. at 2095, the Court has readily acknowledged that the test is not whether a religious institution derives some benefit from the government program. In upholding the constitutionality of federal aid for construction of buildings to be used for secular education at church-related colleges and universities, the Court stated:

" * * * Construction grants surely aid these institutions in the sense that the construction of buildings will assist them to perform their various functions. But bus transportation, textbooks and tax exemptions all give aid in the sense that religious bodies would otherwise have been forced to find other sources from which to finance these services. Yet all of these forms of governmental assistance have been upheld. [Everson, *supra*, Allen, *supra*, Walz, *supra*] * * * The crucial question is not whether some bene-

fit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." Tilton, *supra,* 403 U.S. at 679, 91 S.Ct. at 2096. *See also* Walz, *supra,* 397 U. S. at 671–672, 90 S.Ct. at 1412–1413.

In order to determine what factors distinguish permissible from prohibited aid, it is necessary to review briefly the Supreme Court decisions which have considered forms of aid to church-related schools under the primary effect test. In Everson, the Supreme Court upheld a state law which authorized the use of tax-raised funds to reimburse parents for the costs of transporting students to and from public and private schools. The Court held that the state could extend the benefits of public welfare legislation to all citizens despite the fact that such aid helped children to get to church-related schools and that there was the possibility that some children might not have been sent to church-related schools if their parents were required to pay transportation costs. The Court found that the purpose and effect of the law was to promote general public welfare by helping parents get their children safely to and from accredited schools. The Court concluded that the First Amendment does not require that the state cut off sectarian schools from general services "so separate and so indisputably marked off from the religious function." Everson, *supra,* 330 U.S. at 18, 67 S.Ct. 504, at 513–514.

In Allen, the Supreme Court upheld a New York law which required local public school authorities to lend textbooks free of charge to all students in grades 7 through 12 including students attending private schools. The Court found no violation of the primary effect test for although the Court recognized that books can have an inherent religious significance which bus rides do not, the law provided that only secular books could be loaned and each book had to be approved by the public school authorities. The Court noted that the state has a legitimate interest in the manner in which private schools perform their secular education function. On the basis of the "meager record" in the case, the Court could not conclude that

" \* \* \* either that all teaching in a sectarian school is religious or that the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." 392 U.S. at 248, 88 S.Ct. 1923, at 1929.

Therefore, the Court upheld the law as providing a general service to all students which was consistent with the state's interest in promoting secular education in all schools.

In Lemon, the Court held that a Pennsylvania law which reimbursed private schools for the cost of teachers' salaries, textbooks and instructional materials in certain specified secular subjects and a Rhode Island law which supplemented the salaries of teachers of secular subjects in private elementary schools violated the Establishment Clause because the programs involved excessive government entanglement with religion. Although the Court found it unnecessary to apply the primary effect test, the Court's analysis of the statutes in terms of this test is instructive. The Court reaffirmed its agreement in principle with the holding in Allen that "secular and religious education are identifiable and separable." However, the Court noted that both the Pennsylvania and Rhode Island legislatures recognized that "church-related elementary and secondary schools have a significant religious mission and that a substantial portion of their activities are religiously oriented." Therefore, in order to guarantee that state financial aid supports only secular education in these schools, the two legislatures imposed statutory restrictions on their aid programs. Although the Court did not reach the question of whether these restrictions effectively prevented the aid programs from having a primary effect which violated the Establishment Clause, it is clear from the opinion that the Court agreed that given the nature of the

proposed aid and the character of the school, the state was required to impose restrictions to insure that the aid benefited only secular education in order to comply with the Establishment Clause.

" * * * The Rhode Island Legislature has not, *and could not,* provide state aid on the basis of a mere assumption that secular teachers under religious discipline can avoid conflicts. *The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion*—indeed the State here has undertaken to do so." Lemon, *supra,* 403 U.S. at 619, 91 S.Ct. 2105, at 2114 (emphasis added).

Finally, in Tilton, the Court upheld the constitutionality of federal aid to church-related colleges and universities for construction of buildings and facilities used exclusively for secular educational purposes. In evaluating the statute in terms of its effect, the Court first reviewed the provisions of the law and found that it was carefully drafted to insure that federally subsidized buildings would be devoted to secular and not religious functions. However, the Court concluded that a provision of the law which permitted unrestricted use of the buildings after 20 years violated the Establishment Clause primary effect test. This decision represents the first instance in which the Court has invalidated legislation under that test.

" * * * It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. * * * If, at the end of 20 years the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion." Tilton, *supra,* 403 U.S. at 683, 91 S.Ct. 2091, at 2098.

The Court next examined the administration of the law and found that the restrictions on use had been complied with by the recipient institutions. Finally, on the basis of the record before it, the Court refused to conclude that religion so permeated the secular education provided by church-related colleges and universities that their religious and secular education functions were inseparable and that therefore government support of any activity of these institutions necessarily involved impermissible support of religion.[6]

These cases establish the following points of reference for any application of the primary effect test. First, absent any evidence to the contrary, the Supreme Court accepts the principle that secular and religious education in church-related schools are identifiable and separable. Second, the state has a legitimate interest in promoting the general welfare and the secular education of all school children. Third, the state may enact programs to promote the general welfare which include sectarian school students among the recipients provided the aid given has no inherent religious significance (*e. g.,* bus rides, public health services), even though the aid may facilitate the operation of sectarian schools. Fourth, the state may enact programs to promote secular education in accredited schools, including church-related schools, provided the state can be certain from the nature of the aid granted or the restrictions placed upon its use that the programs will assist only secular education in church-related schools and provided further that the restrictions required to insure secular use do not give rise to excessive government entanglement with religion in the administration of the aid program. Finally, in order for a court to conclude that a statute has the constitutionally impermissible effect of advancing religion, the court is not required to conclude that the scheme of assistance will necessarily

---

6. The Court also found that the legislation did not foster excessive government entanglement with religion.

aid religion; the court can conclude that the statute has the effect of advancing religion if the terms of the statute fail to preclude a possible use of government funds to promote religious exercises.

■ The Act under review reimburses parents who have expended money for tuition at nonpublic schools. The legislative findings and declaration of policy underscore the legislative judgment that this type of aid will have the effect of enabling nonpublic schools, which include church-related schools, to continue to operate in Pennsylvania. The cases are clear that the state cannot directly support religious education in church-related schools although in some circumstances the state may provide sectarian schools with "secular, neutral or non-ideological services, facilities, or materials." Lemon, *supra*, 403 U.S. at 616, 91 S.Ct. 2105, at 2113. The present Act contains no provisions to insure that state funds are restricted to such purposes. Clearly an unrestricted grant of funds by the state directly to church-related schools would constitute state support of religious instruction and worship in violation of the Establishment Clause.

" * * * General subsidies of religious activities would, of course, constitute impermissible state involvement with religion." Walz, *supra*, 397

U.S. at 690, 90 S.Ct. 1409, at 1422 (Brennan, J. concurring).

Recognizing this, defendants maintain that the Act is constitutional because the Act aids the parents and not the schools. The state enters into no direct relationship with nonpublic schools because funds are paid directly to parents who have paid tuition to nonpublic schools. Once the parents receive the funds, the state has no control over their use.[7] Furthermore, defendants argue that in Everson and Allen the Supreme Court distinguished between aid to parents and students and aid to institutions and held that state aid to parents and students does not have the primary effect of advancing religion even though sectarian schools benefit from transportation services and non-religious textbook loans.

■ First, we disagree with defendants' reading of Everson and Allen. The critical factor in both cases was that the subsidized school activities were non-ideological or secular and therefore the public grants did not directly support religious education in the sectarian schools, although the aid did support the operation of the schools. But the fact that aid is given to parents in itself does not prevent the subsidy from having a primary effect of supporting religious instruction and worship in church-related schools. In Allen, the fact that the Court

7. Defendants cite Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L.R.A. 203 (1894), for the proposition that payment of state funds is not unconstitutional because the recipients may use these funds for religious purposes. *Hysong* involved the question of whether a public school could employ Catholic nuns to teach secular subjects. One argument raised by plaintiffs was the fact that the nuns had taken a vow of poverty and turned over their salaries to their church and therefore state salary payments were being used to support religion. The Pennsylvania Supreme Court rejected this argument on the grounds that "American men and women of sound mind and 21 years of age, can make such disposition of their surplus *earnings* as suits their own notions." *Hysong, supra,* 164 Pa. at 656, 30 A. at 484 (emphasis added).

*Hysong* is clearly distinguishable from the case before us because there is no question that individuals are free to dispose of money earned by them in the course of their employment for whatever purposes they choose, including support of religion. In fact the principle of government neutrality in religious affairs is premised on the belief that religions should be supported solely by the voluntary contributions of their members. In determining whether state payments under the Act are constitutional, we must examine the criteria which qualify an individual for receipt of the funds. Certainly there can be no objection to state payments to state employees for secular teaching services in the public schools. The issue before this court is whether individuals may receive state funds solely because they have paid tuition at a church-related school.

considered the parents and students as the beneficiaries of the aid would not have prevented the Court from striking down the law if it provided for loans of religious books to the schools. The school aid cases emphasize that the court must examine the character of the aided activity rather than the manner in which aid is given in order to determine whether the state subsidy has the primary effect of advancing religion.

Second, we conclude that the effect of the Act is to aid the schools and therefore the failure of the state to insure that the funds are restricted to secular education or general welfare services renders the Act unconstitutional.[8] Parents are eligible to receive payments under the Act because they have paid tuition at a nonpublic school. Tuitions are the "very life blood" of private educational institutions, Almond v. Day, 197 Va. 419, 427, 89 S.E.2d 851, 857 (1955), because they are the source from which many educational services, secular as well as religious, are funded. If parents cannot afford to pay the tuition, they must take their child out of the nonpublic schools and if enough parents are unable to pay these costs, the schools will be forced to close. It was precisely this possibility that led the Pennsylvania General Assembly to pass the Act under review. By providing parents with additional funds because they have paid tuition at nonpublic schools, the Commonwealth is trying to insure the continued ability of the parents to afford tuition costs and therefore the continued existence of nonpublic schools, including sectarian schools. The necessary effect of such a program, if it is to succeed, is that the schools will be aided by state funds. The state cannot maintain that the Act has the purpose of promoting education by supporting non-

public schools and then deny that the effect of the Act is to aid these schools.

■ Defendants argue that we cannot ascertain that parents will be encouraged to send their child to church-related schools because of the state aid program. Parents may send their child to a sectarian school one year and despite the reimbursement payment decide to enroll their child in another type of school the next year. Therefore defendants argue that we cannot conclude that the Act has the necessary effect of advancing religion. However, Tilton established that a government aid program can be invalidated on the basis of a significant risk that the aid may serve to support religious activity at some future time. In Tilton, there was no evidence that the colleges receiving construction grants planned to convert the buildings into chapels or otherwise use them for religious activities after twenty years had passed. Nevertheless, the Court found the possibility of such use enough to strike down the provision of the statute which permitted unrestricted use of the buildings after twenty years. It is clear that a possible and quite likely use of the aid under review is to enable parents to continue to pay tuition at sectarian schools. Tuition payments support both religious and secular education at these schools. The mere fact that the Act does not require that parents use the funds to pay tuition at church-related schools does not relieve the state of its duty to preclude the use of its funds to support religious activities.

State courts have held that tuition grant programs in which the state channeled funds through the parents or students to the schools violate the First Amendment and state constitutional provisions.[9] Almond v. Day, *supra,*

---

8. If the Act did include restrictions on the use of the funds, the Act would also have to avoid excessive government entanglement with religion in its administration of these restrictions. *See Lemon* and *Tilton.* The combination of the primary effect and entanglement tests clearly restricts the scope of permissible government aid to religious schools.

9. "The parent or guardian to whom the tuition fees are paid is merely the conduit or channel through whom the aid from the State to the school is transmitted." Almond v. Day, *supra,* 89 S.E. 2d at 857.

"We reject the argument that the tuition grants provided under the Act do not constitute aid to the participating schools.

Hartness v. Patterson, 179 S.E.2d 907 (S. Carolina 1971), Opinion of the Justices, 259 N.E.2d 564 (Mass.1970). Defendants argue that unlike the "conduit" plans, the Pennsylvania Act does not make payments to parents in a form that can only be used at an educational institution. Therefore, it cannot be established that the dollar used to pay tuition is the dollar the parents received from the state. However, we do not perceive any constitutional significance in the fact that payments are made in the form of reimbursement to the parents, a conduit plan or directly to the school. The economic consequences are the same for the church-related school whether it receives funds through a direct grant, a conduit plan or because the state increases family incomes through a reimbursement program which enables the parents to continue to pay tuition. In each case, tax-raised funds are being used to subsidize religious education.

Finally, even if we held that the Act does not aid sectarian schools, we must still conclude that the Act supports religion because it aids parents in providing a religious education for their children. It would seem indisputable that at least one, if not the main, purpose of a parent's sending his child to a religious school is to insure the early inculcation of religion. *See* Walz, *supra,* 397 U.S. at 671, 90 S.Ct. 1409, at 1412. Assuming equal secular educational standards as between public and religious schools, it is an almost inescapable sequitur that the statutory reimbursement is solely to enable the parents to augment the public school secular education with religious training. If parents cannot afford to provide religious education for their children in sectarian schools without state aid, then by providing a program for aiding the parents, the state is plainly advancing religious education.

The state has no more power to subsidize parents in providing a religious education for their child than it has to subsidize church-related schools to do so. *See* Brusca v. State of Missouri ex rel. State Bd. of Ed., 332 F.Supp. 275 (E.D. Mo.1971).

Having concluded that the Establishment Clause precludes state reimbursement of sums that parents have paid as tuition to schools that provide religious education, we need not consider defendants' arguments that the complaint should be dismissed for lack of standing and failure to state a claim under the Free Exercise and Equal Protection Clauses. We therefore deny defendants' motion to dismiss the complaint.

### APPENDIX A

PARENT REIMBURSEMENT ACT
FOR NONPUBLIC EDUCATION
ACT NO. 92 [10]
H. B. NO. 1379

An Act creating an authority for the purpose of avoiding increased costs of public education by providing partial reimbursement for nonpublic education and defining its powers and duties.

*The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:*

Section 1.  Short Title

This act shall be known and may be cited as the "Parent Reimbursement Act for Nonpublic Education."

Section 2.  Legislative Finding; Declaration of Policy

It is hereby determined and declared as a matter of legislative finding:

(1) That parents who send their children to nonpublic schools assist the State in reducing the rising costs of public education.

---

Students must pay tuition fees to attend institutions of higher learning and the institutions depend upon the payment of such fees to aid in financing their operations. While it is true that the tuition grant aids the student, it is also of material aid to the institution to which it is paid." Hartness v. Patterson, 255 S.C. 503, *supra,* 179 S.E.2d 907 at 909.

10.  24 P.S. §§ 5701 to 5711.

(2) The welfare of the Commonwealth requires that this and future generations of school age children be assured ample opportunity to develop to the fullest their intellectual capacities. To further this objective the Commonwealth has had in force for many years a compulsory school attendance law.

(3) In the exercise of their constitutional right to choose nonpublic education for their children, parents who support such education make a major contribution to the public welfare. However, the immense impact of inflation, plus sharply rising costs of education, now combine to place in jeopardy the ability of such parents fully to carry this burden.

(4) Should parents of children now enrolled in nonpublic schools be forced by economic circumstances to transfer any substantial number of their children to public schools, an enormous added financial, educational and administrative burden would be placed upon the public schools and upon the taxpayers of the State. Without allowance for inflationary increase, the annual operating cost of educating in public schools, the five hundred thousand students now enrolled in Pennsylvania's nonpublic schools would be an additional four hundred million dollars ($400,000,000). Necessarily added capital costs to construct new facilities or acquire existing facilities would be in excess of one billion dollars ($1,000,000,-000). Any substantial portion of these operating and capital costs would be an intolerable public burden and present standards of public education would be seriously jeopardized. Therefore, parents who maintain students in nonpublic schools provide a vital service to the Commonwealth.

Wherefore, it is declared to be the public policy of the Commonwealth:

That, in order to reimburse parents partially for this service so vitally needed by the Commonwealth, and in order to foster educational opportunity for all children, a program of Parent Reimbursement for Nonpublic Education is hereby established.

Section 3. Definitions

The following terms, whenever used or referred to in this act, shall have the following meanings, except in those instances where the context clearly indicates otherwise:

(1) "Parent" means a resident of the Commonwealth of Pennsylvania who is a parent of a child enrolled in a nonpublic school or a person standing in loco parentis to such child.

(2) "Nonpublic school" means any school, other than a public school, within the Commonwealth of Pennsylvania, wherein a resident of the Commonwealth may legally fulfill the compulsory school attendance requirements of law and which meets the requirements of Title VI of the Civil Rights Act of 1964 (Public Law 88–352).

(3) "Student" means a resident of the Commonwealth of Pennsylvania who is enrolled in a nonpublic school.

(4) "Parent Reimbursement Fund" means the fund created by this act.

Section 4. Pennsylvania Assistance Authority

There is hereby created a body corporate and politic to be known as the Pennsylvania Parent Assistance Authority, which shall consist of five members appointed by the Governor and which shall have responsibility for the administration of the program created by this act. All members shall be of full age, citizens of the United States, and residents of the Commonwealth and shall be appointed for terms of five years each. The members of the authority shall select from among themselves a chairman and a vice-chairman. The authority may employ a secretary and such other employes as it may require. Three members of the authority shall constitute a quorum for its meetings. Members shall receive no compensation for their services but shall be reimbursed for their expenses actually and necessarily incurred by them in the performance of their duties under this act. The authority shall have power to make and promulgate rules and regulations for the administration of

this act: Provided, however, That it shall exercise no direction, supervision or control over the policy determinations, personnel, curriculum, program of instruction or any other aspect of the administration or operation of any nonpublic school or schools.

The authority shall have no power, at any time or in any manner to pledge the credit or taxing power of the Commonwealth, nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth, and all contracts between the authority and parents or other persons in loco parentis shall be satisfied solely from funds provided under this act.

Section 5. Parent Reimbursement Fund

There is hereby created for the special purpose of this act, a Parent Reimbursement Fund. Beginning July 1, 1971, twenty-three per cent of the tax revenue collected by the Department of Revenue, pursuant to the act of July 22, 1970 (P. L. 513), known as the "Pennsylvania Cigarette Tax Act," shall be paid into the State Treasury to the credit of the Parent Reimbursement Fund.

Moneys in the Parent Reimbursement Fund are hereby appropriated to the Pennsylvania Parent Assistance Authority, to be used solely for the purposes of this act.

All expenses incurred in connection with the administration of this act shall be paid solely out of the Parent Reimbursement Fund.

Section 6. Eligibility

In order to be eligible for tuition reimbursement hereunder, the parent of a student shall, at the completion of the school year but not later than July fifteenth, file with the Parent Assistance Authority a verified statement that the student has completed the school year in a nonpublic school or schools and, in addition, the following information: (i) the name and address of the parent; (ii) the name, address and birth date of the student; (iii) the name and address of the nonpublic school or schools in which the

student completed the school year and (iv) a receipted tuition bill or copy of the executed contract under which the student attended the nonpublic school or schools.

Section 7. Tuition Reimbursement Payments to Parents

Upon the filing by a parent of the verified statement as required by section 6, the Parent Assistance Authority shall make a tuition reimbursement payment to such parent in the amount of (i) seventy-five dollars ($75) for each elementary school student to whom the parent bears a parental relationship and one hundred fifty dollars ($150) for each secondary student to whom the parent bears a parental relationship, or (ii) the actual amount of tuition paid or contracted to be paid by a parent, whichever is lesser.

Reimbursement payments to parents hereunder shall be made not later than September fifteenth in the school year following the school year for which tuition reimbursement payments are being made.

Section 8. Penalties

The Parent Assistance Authority shall have power to employ means reasonably necessary to determine the accuracy of all statements submitted by parents in connection with reimbursement payments hereunder. Any person who, by means of a wilfully false statement, secures or attempts to secure or aids or abets any person in securing reimbursement payment hereunder, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine of not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding one year, or both, and shall also be sentenced to make restitution of any moneys he has received by reason of any false statement.

Section 9. Insufficient Moneys in Fund

In the event that, in any fiscal year, the total amount of moneys which were actually paid into the Parent Reimbursement Fund shall be insufficient to pay

the total number of claims submitted by parents to the Parent Assistance Authority, the reimbursement payments provided for in section 7 shall be proportionate in amount to the per cent which the total amount of moneys in the Parent Reimbursement Fund bears to the total amount of claims.

Section 10.  Severability

If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect.  If a part of this act is invalid, in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

Section 11.  Effective Date

This act shall take effect immediately.

Approved the 27th day of August A.D. 1971.