SLOAN, TREASURER OF PENNSYLVANIA, ET AL.
*v.* LEMON ET AL.

No. 72–459.   Argued April 16, 1973—Decided June 25, 1973*

POWELL, J., delivered the opinion of the Court, in which DOUG-
LAS, BRENNAN, STEWART, MARSHALL, and BLACKMUN, JJ., joined.
BURGER, C. J., filed a dissenting opinion, in which WHITE and REHN-

*Together with No. 72–620, *Crouter* v. *Lemon et al.*, also on
appeal from the same court.

QUIST, JJ., joined, *ante*, p. 798. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *ante*, p. 813.

*Israel Packel*, Attorney General of Pennsylvania, argued the cause for appellant Sloan in No. 72–459. With him on the brief were *Peter W. Brown* and *J. Justin Blewitt, Jr.*, Deputy Attorneys General. *William Bentley Ball* argued the cause for appellants Diaz et al. in No. 72–459. With him on the briefs were *Joseph G. Skelly, James E. Gallagher, Jr., C. Clark Hodgson, Jr.*, and *William D. Valente. Henry T. Reath* argued the cause and filed a brief for appellant in No. 72–620.

*Theodore R. Mann* argued the cause for appellees in both cases. With him on the brief was *Leo Pfeffer.*†

MR. JUSTICE POWELL delivered the opinion of the Court.

On June 28, 1971, this Court handed down *Lemon* v. *Kurtzman*, 403 U. S. 602, in which Pennsylvania's "Nonpublic Elementary and Secondary Education Act" was held unconstitutional as violative of the Establishment Clause of the First Amendment. That law authorized the State to reimburse nonpublic, sectarian schools for their expenditures on teachers' salaries, textbooks, and instructional materials used in specified "secular" courses.

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *Acting Solicitor General Friedman, Assistant Attorney General Wood, Harriet S. Shapiro, Walter H. Fleischer*, and *Thomas G. Wilson* for the United States; by *Joseph J. Carlin* for the city of Philadelphia; and by *Ethan A. Hitchcock* for the National Association of Independent Schools, Inc.

Briefs of *amici curiae* urging affirmance in both cases were filed by *Stephen J. Pollak* and *David Rubin* for the National Education Association et al., and by *Samuel Rabinove, Arnold Forster, Paul Hartman, Joseph B. Robison, Beverly Coleman*, and *Elliot Rothenberg* for the American Jewish Committee et al.

The Court's ruling was premised on its determination that the restrictions and state supervision required to guarantee that the specified aid would benefit only the nonreligious activities of the schools would foster "excessive entanglement" between government and religion. *Id.*, at 620–622.

On August 27, 1971, the Pennsylvania General Assembly promulgated a new aid law, entitled the "Parent Reimbursement Act for Nonpublic Education," providing funds to reimburse parents for a portion of tuition expenses incurred in sending their children to nonpublic schools. Shortly thereafter, this suit, challenging the enactment and seeking declaratory and injunctive relief, was filed in the United States District Court for the Eastern District of Pennsylvania. The plaintiffs were Pennsylvania residents and taxpayers who had paid the state tax used to finance the aid program, and at least one plaintiff was also the parent of a child attending a public school within the State. The State Treasurer was named as the defendant and was sued in that capacity. Motions to intervene on the side of the State were granted to a number of parents whose children were enrolled in nonpublic schools and who were therefore entitled to payments under the challenged law.

The defendant and intervenors filed a motion to dismiss the complaint for failure to state a claim upon which relief might be granted. The motion was considered by a properly constituted three-judge District Court. On April 6, 1972, the panel denied the motion in a full opinion explicating its views and holding that the law violated the Establishment Clause. 340 F. Supp. 1356. On the basis of that opinion, the District Court subsequently issued an order granting plaintiffs' motion for summary judgment and permanently enjoining the disbursement of any funds under the Act. Its

order also ruled that the Act could not properly be viewed as containing a separable provision for aid to parents whose children attended *nonsectarian,* nonpublic schools.

Direct appeals were docketed in this Court by the State Treasurer and by the several intervenors.[1] We noted probable jurisdiction, consolidated the appeals for oral argument, and scheduled the cases to be argued with the several appeals in a case from New York involving an issue in common with this case. 410 U. S. 907 (1973). We have today held in *Committee for Public Education & Religious Liberty* v. *Nyquist, ante,* p. 756, that New York's tuition reimbursement legislation has the impermissible effect of advancing religious institutions and is therefore unconstitutional under the Establishment Clause. Because we find no constitutionally significant difference between New York's and Pennsylvania's programs, that decision compels our affirmance of the District Court's decision here.

I

Pennsylvania's "Parent Reimbursement Act for Nonpublic Education"[2] provides for reimbursement to parents who pay tuition for their children to attend the State's nonpublic elementary and secondary schools. Qualifying parents are entitled to receive $75 for each dependent enrolled in an elementary school, and $150 for each dependent in a secondary school, unless that amount exceeds the amount of tuition actually paid.

---

[1] No. 72–459, *Sloan* v. *Lemon,* is an appeal filed by the State Treasurer and by 12 intervening parents, two of whom are the Watsons—the parents of a child registered in a nonreligious, private school. No. 72–620, *Crouter* v. *Lemon,* is a separately docketed appeal initiated by another one of the intervenors.

[2] Pa. Laws 1971, Act 92, Pa. Stat. Ann., Tit. 24, §§ 5701–5709 (Supp. 1973–1974) (the entire enactment is printed in an appendix to the District Court's opinion, 340 F. Supp. 1356, 1365–1368).

The money to fund this program is to be derived from a portion of the revenues from the State's tax on cigarette sales, and is to be administered by a five-member committee appointed by the Governor, known as the "Pennsylvania Parent Assistance Authority." In an effort to avoid the "entanglement" problem that flawed its prior aid statute, *Lemon* v. *Kurtzman, supra,* the new legislation specifically precludes the administering authority from having any "direction, supervision or control over the policy determinations, personnel, curriculum, program of instruction or any other aspect of the administration or operation of any nonpublic school or schools." [3] Similarly, the statute imposes no restrictions or limitations on the uses to which the reimbursement allotments can be put by the qualifying parents.

Like the New York tuition program, the Pennsylvania law is prefaced by "legislative findings," which emphasize its underlying secular purposes: parents who send their children to nonpublic schools reduce the total cost of public education; "inflation, plus sharply rising costs of education, now combine to place in jeopardy the ability of such parents fully to carry this burden"; if the State's 500,000 nonpublic school children were to transfer to the public schools, the annual operating costs to the State would be $400 million, and the added capital costs would exceed $1 billion; therefore, "parents who maintain students in nonpublic schools provide a vital service" and deserve at least partial reimbursement for alleviating an otherwise "intolerable public burden." [4] We certainly do not question now, any more than we did two Terms ago in *Lemon* v. *Kurtzman,*[5] the reality and

---

[3] Act 92, *supra,* § 5704.

[4] *Id.,* § 5702.

[5] These findings are similar to the ones which supported the Pennsylvania teacher-salary reimbursement law involved in *Lemon* v. *Kurtzman.* There the Court noted that the Act was passed "in re-

legitimacy of Pennsylvania's secular purposes. See *Committee for Public Education & Religious Liberty* v. *Nyquist, ante,* at 773.

We turn, then, to consider the new law's effect. As the case was decided in the District Court initially on defendant's and intervenors' motions to dismiss, the court accepted as true plaintiffs' allegation with respect to the identifying characteristics of the schools qualifying under the Act. 340 F. Supp., at 1359. Those characteristics are largely the same as the ones used by the District Court to describe typical sectarian schools in New York. *Ante,* at 767–768. In its subsequent order granting summary judgment in plaintiffs' favor, the District Court indicated that "more than 90% of the children attending nonpublic schools in the Commonwealth of Pennsylvania are enrolled in schools that are controlled by religious organizations or that have the purpose of propagating and promoting religious faith." App. 87a. This finding is consistent with the evidence in *Lemon* v. *Kurtzman,* in which the Court noted that more than 96% of the children attending nonpublic schools in Pennsylvania in 1969 "attend[ed] church-related schools, and most of these schools are affiliated with the Roman Catholic church." 403 U. S., at 610.

For purposes of determining whether the Pennsylvania tuition reimbursement program has the impermissible effect of advancing religion, we find no constitutionally significant distinctions between this law and the one declared invalid today in *Nyquist.* Each authorizes the States to use tax-raised funds for tuition reimbursements

---

sponse to a crisis that the Pennsylvania Legislature found existed in the State's nonpublic schools due to rapidly rising costs." 403 U. S., at 609. The Court held that the State's interest in enhancing "the quality of the secular education in all schools covered by the compulsory attendance laws" was clearly legitimate and "must therefore be accorded appropriate deference." *Id.,* at 613.

payable to parents who send their children to nonpublic schools. Neither tells parents how they must spend the amount received. While the Pennsylvania grants are more generous ($75 to $150 as opposed to $50 to $100), and while Pennsylvania imposes no ceiling on the number of children for whom parents may claim tuition reimbursement or on the percentage of the tuition bill for which parents may be reimbursed,[6] these considerations are irrelevant to the First Amendment question.

Neither the State Treasurer nor appellant-intervenor in No. 72–620 has suggested any way in which the present law might be distinguished from the one in question in *Nyquist*. The intervenors in No. 72–459 have, however, proffered a distinction which deserves discussion because it serves to underline the basis for our ruling in these cases. Intervenors suggest that New York's law might be differentiated on the ground that, because tuition grants there were available only to parents in an extremely low income bracket (less than $5,000 of taxable income), it would be reasonable to predict that the grant would, in fact, be used to pay tuition, rendering the parent a mere "conduit" for public aid to religious schools. Since Pennsylvania authorizes grants to. all parents of children in nonpublic schools—regardless of income level—it is argued that no such assumption can be made as to how individual parents will spend their reimbursed amounts.[7]

---

[6] Since the grants in this case are not limited to reimbursing only a percentage of the tuition bill, the argument could not be made here that the law contains any "statistical guarantee of neutrality," *Nyquist, ante,* at 787.

[7] Brief for Appellants Diaz et al. 23–24. It was also alleged, as a ground of distinction between the Pennsylvania and New York tuition reimbursement grants, that there was less likelihood of political divisiveness under the Pennsylvania scheme because it is financed out of a self-perpetuating fund derived from the state cigarette tax. Thus, it is contended that no annual appropriations

Our decision, however, is not dependent upon any such speculation. Instead we look to the substance of the program, and no matter how it is characterized its effect remains the same. The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or as a reward for having done so, at bottom its intended consequence is to preserve and support religion-oriented institutions. We think it plain that this is quite unlike the sort of "indirect" and "incidental" benefits that flowed to sectarian schools from programs aiding *all* parents by supplying bus transportation and secular textbooks for their children. Such benefits were carefully restricted to the purely secular side of church-affiliated institutions and provided no special aid for those who had chosen to support religious schools. Yet such aid approached the "verge" of the constitutionally impermissible. *Everson* v. *Board of Education,* 330 U. S. 1, 16 (1947). In *Lemon* v. *Kurtzman,* we declined to allow *Everson* to be used as the "platform for yet further steps" in granting assistance to "institutions whose legitimate needs are growing and whose interests have substantial political support." 403 U. S., at 624. Again today we decline to approach or overstep the "precipice" against which the Establishment Clause protects. We hold that Pennsylvania's tuition grant scheme violates the constitutional mandate against the "sponsorship" or "financial support" of religion or

---

are required and there will be less likelihood of divisive political pressure for increased grants and expanded aid. We addressed the problem of potential political divisiveness in Part III of our opinion in *Nyquist, ante,* at 794–798. At most, the difference here is one in degree and one not likely to diminish perceptibly over the long term the inevitable demands for increased and expanded aid.

religious institutions. *Walz* v. *Tax Comm'n*, 397 U. S. 664, 668 (1970).[8]

## II

Apart from the Establishment Clause issues central to this case, appellant-intervenors in No. 72–459 make an equal protection claim that was not directly ruled on by the District Court. These intervenors are 12 parents whose children attend nonpublic schools. Two parents, the Watsons, send their child to a nonsectarian school while the remainder send their children to sectarian schools. The District Court's final order enjoined the State Treasurer from disbursing funds to any parents, irrespective of whether their children attended sectarian or nonsectarian schools. The court considered and rejected the argument that the state law should be treated "as containing a separable provision for aid to parents of children attending nonpublic schools that are not church related."[9] Although the Act contained a severability clause,[10] the court reasoned that, in view of the fact that

---

[8] Appellants have also sought to distinguish *Nyquist* on the ground that Pennsylvania's legislation is more carefully drafted to avoid excessive administrative entanglements; the program is administered by an independent authority rather than by the Commissioner of Education, and its funds are not derived from the general revenues available for education but from a separate fund. Brief for Appellant Diaz et al. 24. Since Pennsylvania's law falls under the second aspect of our test because its effect, inevitably, is to advance religion, we need not address this claimed distinction.

[9] Order of District Court, dated June 20, 1972, scheduling oral arguments on plaintiffs' summary judgment motion and outlining the questions to be argued at that time, reprinted in App. 84a–85a.

[10] "Section 10. Severability.—If a part of this act is invalid, all valid parts *that are severable* from the invalid part remain in effect. If a part of this act is invalid, in one or more of its applications, the part remains in effect in all valid applications *that are severable* from the invalid applications." Pa. Laws 1971, Act 92. (Emphasis supplied.)

so substantial a majority of the law's designated beneficiaries were affiliated with religious organizations, it could not be assumed that the state legislature would have passed the law to aid only those attending the relatively few nonsectarian schools.[11]

Appellants ask this Court to declare the provisions severable and thereby to allow tuition reimbursement for parents of children attending schools that are not church related. If the parents of children who attend nonsectarian schools receive assistance, their argument continues, parents of children who attend sectarian schools are entitled to the same aid as a matter of equal protection. The argument is thoroughly spurious. In the first place, we have been shown no reason to upset the District Court's conclusion that aid to the nonsectarian school could not be severed from aid to the sectarian. The statute nowhere sets up this suggested dichotomy between sectarian and nonsectarian schools, and to approve such a distinction here would be to create a program quite different from the one the legislature actually adopted. See *Champlin Refining Co.* v. *Corporation Commission of Oklahoma*, 286 U. S. 210, 234 (1932); cf. *Tilton* v. *Richardson*, 403 U. S. 672, 683–684 (1971) (plurality opinion). Even if the Act were clearly severable, valid aid to nonpublic, nonsectarian schools would provide no lever for aid to their sectarian counterparts. The Equal Protection Clause has never been regarded as a bludgeon with which to compel a State to violate other provisions of the Constitution. Having held that tuition reimbursements for the benefit of sectarian schools violate the Establishment Clause, nothing in the Equal Protection Clause will suffice to revive that program. Cf.

---

[11] Final Order of District Court, dated July 21, 1972, permanently enjoining enforcement of the Act, reprinted in App. 87a.

*Brusca* v. *State Board of Education,* 405 U. S. 1050 (1972), aff'g 332 F. Supp. 275 (ED Mo. 1971).

### III

In holding today that Pennsylvania's post-*Lemon* v. *Kurtzman* attempt to avoid the Establishment Clause's prohibition against government entanglements with religion has failed to satisfy the parallel bar against laws having a primary effect that advances religion, we are not unaware that appellants and those who have endeavored to formulate systems of state aid to nonpublic education may feel that the decisions of this Court have, indeed, presented them with the "insoluble paradox" to which MR. JUSTICE WHITE referred in his separate opinion in *Lemon* v. *Kurtzman.* 403 U. S., at 668.[12] But if novel forms of aid have not readily been sustained by this Court, the "fault" lies not with the doctrines which are said to create a paradox but rather with the Establishment Clause itself: "Congress" and the States by virtue of the Fourteenth Amendment "shall make no law respecting an establishment of religion." With that judgment we are not free to tamper, and while there is "room for play in the joints," *Walz* v. *Tax Comm'n, supra,* at 669, the Amendment's proscription clearly forecloses Pennsylvania's tuition reimbursement program.

*Affirmed.*

[For dissenting opinion of THE CHIEF JUSTICE, see *ante,* p. 798.]

[For dissenting opinion of MR. JUSTICE WHITE, see *ante,* p. 813.]

---

[12] See also *Lemon* v. *Kurtzman,* 403 U. S., at 640 (DOUGLAS, J., concurring); *Lemon* v. *Kurtzman,* 411 U. S. 192, 203 n. 3 (1973).