**AMERICANS UNITED FOR the SEPARATION OF CHURCH AND STATE, a District of Columbia Corporation, et al., Plaintiffs,**

v.

**Winfield DUNN, Individually and in his official capacity as Governor of Tennessee, et al., Defendants.**

**Civ. A. No. 6940.**

United States District Court, M. D. Tennessee, Nashville Division.

Nov. 8, 1974.

Stay Granted Feb. 18, 1975. See 95 S.Ct. 1114.

Gary W. Blackburn, Blackburn & McCune, Nashville, Tenn., for plaintiffs.

David M. Pack, Atty. Gen., of Tenn., and W. Henry Haile, Asst. Atty. Gen., of Tenn., Nashville, Tenn., for defendants.

Richard D. Taylor, Glasgow, Adams & Taylor, Nashville, Tenn., for amicus curiae, The Roman Catholic Diocese of Nashville.

Hugh C. Howser, Howser, Thomas, Summers & Binkley, Nashville, Tenn., for amicus curiae, David Lipscomb College.

Before MILLER, Circuit Judge, GRAY, Chief District Judge, and MORTON, District Judge.

FRANK GRAY, Jr., Chief District Judge:

This action presents a challenge to the constitutionality of the Tennessee Tuition Grant Program (T.C.A. § 49–4601 et seq.), a challenge grounded upon the

proposition that the type of State aid to education afforded thereunder is repugnant to the religious freedom provisions of the First Amendment to the United States Constitution.

The case was brought by a national association incorporated in the District of Columbia and by four individuals who are residents, citizens, and taxpayers of Tennessee. They seek both a declaratory judgment that the Tuition Grant Program is unconstitutional and concomitant injunctive relief against the defendant State officers responsible for its enforcement. Pursuant to the requirements of 28 U.S.C. § 2281, this three-judge District Court was convened to hear and determine the matter, and it is now before the Court for a decision on the merits.[1]

The Tennessee Tuition Grant Program was enacted in 1971 and is codified at Sections 49–4601 through 49–4609 of the Tennessee Code Annotated. Briefly described, the program established by those provisions distributes State funds, in the form of tuition grants to certain eligible students, to both public and private institutions of higher learning located in the State of Tennessee. Students who are eligible within the meaning of T.C.A. § 49–4604 make application to the Tennessee Student Assistance Agency, which was created by T.C.A. § 49–4602, for the tuition grants to attend the Tennessee college or university of their choice. The Agency evaluates applications on the basis of financial need (the amount of tuition charged at the selected school being a primary factor) and prepares a roster of those students to receive grants. Each institution is furnished with a list of the grantees who have designated that particular school, and the school then makes certification that the listed grantees are actually enrolled. The State agency then prepares a draft for each school reflecting the total amount of the grants for students attending that institution. Drafts are not sent to the students; instead, each student is given a certificate reflecting the amount of the grant.

In order to be eligible to participate in the Tuition Grant Program, a school is required by statute only to offer undergraduate academic work leading to a degree and to be accredited by the Southern Association of Colleges and Schools. The only restriction on the use of the State funds pertains to the students' use, that being a requirement that the funds be used for tuition or registration fees. There are absolutely no restrictions on the use of the funds by the schools; indeed, it appears from the record that these funds are treated exactly like any other tuition payment.

At the time of the hearing, tuition grants had been made under the program for the school years 1972–1973 and 1973–1974. In the former, 84 percent of the funds disbursed to private colleges went to religiously affiliated institutions,[2] and 59 percent of the funds disbursed to all colleges went to religiously affiliated institutions. For the 1973–1974 school year, religiously affiliated institutions received 86 percent of funds disbursed to private schools and 63 percent of the total disbursed to both public and private colleges.[3]

■ The plaintiffs contend that the Tuition Grant Program, as described, violates the Establishment Clause of the First Amendment, made applicable to

---

1. The record before the Court, in addition to the pleadings, includes a hearing, agreed stipulations of fact concerning the program's operation, briefs on behalf of both sides to the controversy, and three briefs, *amici curiae,* two of which were filed in behalf of church-sponsored schools and support the defendants' position.

2. Approximately 77 percent of the private schools eligible for participation in the grant program are so-called "church schools," *e. g.,* they are affiliated with a religious sect or denomination, church organization, or church.

3. The foregoing analysis of the statutory provisions and disbursements is based on facts which the parties have stipulated.

the States through the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), in that such disbursement of State funds constitutes an advancement of religious activities at the church-related institutions; and this contention poses the ultimate issue for decision in this case. Having concluded, as a preliminary matter, that this controversy is justiciable, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and that it lies within the Court's jurisdiction, Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), we turn to the discussion of that issue.

█ The guarantee embodied in the Establishment Clause, unlike other protections in the Bill of Rights, is absolute within its scope, and, consequently, sovereign action, although an otherwise permissible exercise of its public welfare powers, which falls within the scope of that guarantee is absolutely prohibited. Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Therefore, the inquiry in this case hinges on the determination of whether Tennessee's exercise here has invaded the province of the Establishment Clause.

In making this determination, the Court must analyze and apply the Supreme Court's interpretation of the Religion Clauses of the First Amendment, as contained in a relatively large body of decisions on the Establishment Clause in general and sovereign aid to church-related schools in particular.

█ As a preface to discussion of these decisions, some general observations can be made about the Supreme Court's treatment of the guarantees embodied in the First Amendment's religious freedom provisions. The decisions demonstrate that the Supreme Court has placed a restrained interpretation on the Establishment Clause, owing to the following factors: the perception of an in-herent conflict between the Establishment Clause and the Free Exercise Clause, Abington School District v. Schempp, *supra,* at p. 222, 83 S.Ct. 1560; reliance on the circumstances existing at the time the Bill of Rights was penned and ratified as limiting the broad thrust of the Establishment Clause's language, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); and the Supreme Court's tolerant attitude toward the States' exercise of public welfare powers and attendant recognition of the importance of private schools in the national education scheme, Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Consistent with this interpretation, the Supreme Court has defined the standard of restraint imposed by the Establishment Clause as being one of "neutrality," Walz v. Tax Commission, *supra,* 397 U.S. p. 668, 90 S.Ct. 1409; and consequently, Church and State are not separated by Thomas Jefferson's "wall," [4] but by a "line," a line which has become a " . . . blurred, indistinct, and variable barrier depending on the circumstances of a particular relationship, . . . . " Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Thus, not every benefit conferred upon church-related institutions is prohibited, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and the problem essentially is one of degree, Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952); Board of Education v. Allen, *supra,* 392 U.S. p. 242, 88 S.Ct. 1923; and the Supreme Court opinions can be viewed as a series of decisions defining the scope of the Establishment Clause in terms of what is and what is not permissible sovereign assistance to religion.

These general observations serve to provide a background for examination of the cases and help to narrow the constitutional issue before us.

█ The issue can be further narrowed by adversion to the well-estab-

---

4. Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1879).

lished proposition that there are three main concerns against which the Establishment Clause protects: "sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Commission, *supra*, 397 U.S. at p. 668, 90 S.Ct. at p. 1411. Inasmuch as a total separation between Church and State is not required, "neutrality" is the standard of restraint required, and inasmuch as not every benefit conferred by the sovereign on religious institutions is proscribed, the constitutional inquiry, therefore, is reduced to the crucial question of whether the questioned sovereign action runs afoul of the Establishment Clause's three main concerns. Committee for Public Education v. Nyquist, *supra*, 413 U.S. p. 772, 93 S.Ct. 2955. Our analysis of the cases, then, is addressed to the manner in which the Supreme Court has approached this precise issue in a series of decisions interpreting the Establishment Clause.

■ There are two different, but overlapping, approaches which can be discerned in the Supreme Court decisions under the Establishment Clause. The first, and most obvious, is the application of the "now well-defined three part test." *Id.* This "test" combines the dual standard, first articulated in Abington School District v. Schempp, *supra*, of whether the statute has (1) of a secular legislative purpose and (2) a "primary effect" that neither advances nor inhibits religion with the additional requirement, first conceived in Walz v. Tax Commission, *supra*, (3) that the administration of the questioned statute must not result in excessive entanglement by the sovereign with religion. These criteria are to be used as "guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired," Tilton v. Richardson, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed. 790 (1971), and,

given the similarity between these criteria and the three main concerns of the Establishment Clause, it follows that the sovereign's action must pass muster under each criterion.

While application of this three-part test has become the standard approach, as evidenced by the block of decisions handed down by the Supreme Court in June, 1973,[5] the briefs before us prompt the conclusion that this standard approach is not the better one to adopt in this case. Because of the particular facts at bar, application of the three-part test is not especially helpful in determining whether the Tuition Grant Program invades the province of the Establishment Clause or in dealing with the contentions urged in support of the statute's constitutionality. But more importantly, perhaps, the Court has been struck by the way in which the application of the three-part test, in the briefs of the defendants and the church schools, has obfuscated, rather than sharpened, the inquiry and has tended to divorce, or isolate, the criteria from the very purpose for which they are to be used. Given this distortion of the criteria which illustrates a misinterpretation of their purposes, the Court feels compelled to fashion another approach which will address more specifically the factors involved here.

■ This second approach stems from our perception of the relevant Supreme Court decisions as being a series of decisions defining the scope of the Establishment Clause in terms of what type or degree of aid is or is not prohibited, based on certain distinctions which, in our opinion, describe the "line" of separation to be applied to the facts in this case. The first of these critical distinctions is found in the decision in Everson v. Board of Education, *supra*, wherein the Supreme Court differentiated between "direct" and "indirect" types of aid by the sovereign to church-related

---

5. Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); Levitt v. Committee for Public Education, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Committee for Public Education v. Nyquist, supra.

schools. In essence, it was held that "aid" to parents and/or students which only indirectly and incidentally conferred a benefit on church schools did not violate the Establishment Clause. Thus, under what has been termed the "child benefit" theory, the Supreme Court in *Everson* drew a line between direct aid to church schools and direct aid to students, some of whom attended church schools. Another type of "direct-indirect" distinction first appeared in Board of Education v. Allen, *supra,* wherein the Court, noting that church schools performed both a secular and sectarian function, drew a line between aid to the secular function and aid to the sectarian function, although recognizing that the sectarian function would be indirectly benefited. In the former, or *Everson,* type of "direct-indirect" distinction, the Supreme Court apparently held that such "aid" was not actually aid within the meaning of the Establishment Clause;[6] in the latter, the aid was acknowledged to be aid within the meaning of the Establishment Clause, but not the type proscribed thereby because of the distinction between the secular and the sectarian function. It is important to note the difference between these two "direct-indirect" distinctions and to recognize that they have remained valid in the recent cases. Indeed, the more recent decisions can be seen as further embellishing these distinctions. Thus, with respect to the *Everson* type, the following qualifications should be added: the sovereign may not confer a "special benefit" on any particular group of students who have chosen to support religious schools, Sloan v. Lemon, *supra,* at p. 832, 93 S.Ct. 2982; financial assistance to students must not provide an incentive for attendance at church-related schools, Committee for

Public Education v. Nyquist, *supra,* 413 U.S. p. 787, 93 S.Ct. 2955; financial assistance to students, instead of schools, does not give a *per se* immunity, (particularly where there are no restrictions as to sectarian use of the funds) *Id.,* p. 781–783, 93 S.Ct. 2955; and direct aid in whatever form, to church-related schools is invalid if no restrictions are placed thereon, *Id.,* 413 U.S. p. 780, 93 S.Ct. 2955. With respect to the distinction between aid to secular functions and aid to sectarian functions, the Supreme Court has pointed out the need to scrutinize the aided "secular" function in terms of that function's potential for religious inculcation, Levitt v. Committee for Public Education, *supra,* 413 U.S. at p. 480, 93 S.Ct. 2814, and has further indicated that, in cases where a school was so permeated with religious indoctrination that the secular and sectarian functions were inseparable, no direct aid to that school could be held valid, Tilton v. Richardson, *supra,* 403 U.S. p. 687, 91 S.Ct. 2091; Hunt v. McNair, *supra,* 413 U.S. at p. 746, 93 S.Ct. 2868. In this same vein, the Court has also drawn a distinction between higher and secondary education when considering the degree of religious indoctrination. *Id.*[7] Finally, in administering a statute with adequate restrictions as to the use of funds, the sovereign must avoid excessive entanglement with religion. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

■ Keeping in mind the three main concerns embodied in the Establishment Clause's protection, three general conclusions flow from the foregoing analysis. First, properly restricted sovereign "aid" to a broad range of students, which incidentally and indirectly confers a benefit on church-related

---

6. See also: Walz v. Tax Commission, supra, 397 U.S. at p. 675, 90 S.Ct. 1409.

7. It should be noted, however, that this distinction was reached in these cases only because the statutes under attack did restrict the use of the funds and, therefore, the plaintiffs were forced to argue that any direct aid to the schools in question was invalid because of the permeation of religious indoctrination. In both cases, the plaintiffs failed because they were unable to show anything more than a formalistic relationship between the schools and the "sponsoring" churches.

schools attended by some of those students, is not violative of the First Amendment because it is not aid within the meaning of the Establishment Clause, *i.e.*, it is not actually aid and does not constitute "sponsorship" or "financial support." Second, direct sovereign aid to church-related schools is not unconstitutional if the aid is exclusively restricted to the secular function of those schools, provided that the two functions can be separated and that enforcement of the restrictions does not "involve" or "entangle" the sovereign in religious activity. Third, the courts are to look to the substance of a given program, not to the particular form or device utilized.

■ Applying these guidelines to the facts in this case, we find that the constitutional issue is simply resolved, because the Tennessee statute does not pass muster under either of the primary distinctions. First, it cannot be said, on this record, that the funds disbursed under this program do not constitute aid within the meaning of the Establishment Clause so as to bring this case within the holding of Everson v. Board of Education, *supra*. The absence of restrictions in the statute, the facts concerning the operation of the program, and the actual disbursements made thereunder preclude such a finding. Second, the program cannot be upheld on the basis of the distinction between aid to the secular function and aid to the sectarian function because the Tennessee statute does not contain restrictions addressing such a distinction; for, even if the cases recognize a distinction between functions and, in pursuing this distinction, recognize one between higher and secondary education, such distinc-

tions are irrelevant unless the statute itself, through the imposition of restrictions ensuring only secular use of the funds, makes the distinction. Herein lies the fallacy of the defendants' position and the position of the briefs filed by the two church schools; their arguments are based on distinctions which the statute does not address. Moreover, the fact that the use of State funds by the schools is not restricted renders the statute unconstitutional under the Establishment Clause if some of the eligible schools do perform a religious function, *e.g.*, engage in religious activity, because unrestricted aid to such schools would permit the use of such funds for support of religious activity.

■ Thus, our constitutional inquiry is reduced to the simple factual question of whether some of the schools eligible for participation in the Tuition Grant Program have this dual secular-sectarian function and engage in religious activity.[8] The evidence in this record overwhelmingly demonstrates that certain of the eligible schools engage in substantial religious activity, and the nature of such religious activity includes compulsory chapel attendance, formal prayer before each class, church membership requirements for faculty, and the like. Given the presence of such activity at certain of the eligible schools and the absence of restrictions in the statute, the only conclusions are that the statute permits the use of State funds for religious activity and, therefore, that the statute is unconstitutional as violative of the Establishment Clause of the First Amendment. Levitt v. Committee for Public Education, *supra*; Committee for Public Education v. Nyquist, *supra*.[9]

---

8. We note that the degree of religious activity at issue here is something more than formal denominational control and something less than permeation of religious indoctrination at a given school. We need not examine the schools in question to determine whether religious indoctrination so permeates the schools that separation of the secular and sectarian functions is impossible because that issue cannot be reached unless

a statute does restrict the use of funds to secular use only. Our cursory examination, however, has disclosed a number of schools in Tennessee where separation of the two functions would probably be impossible.

9. This is not to say, however, that a similar statute which contained appropriate restrictions to ensure that the funds disbursed thereunder would be used only for secular

722

The Court is further of the opinion that the unconstitutional aspects of the statute and program cannot be severed so as to save the Tuition Grant Program with respect to the nonsectarian colleges and universities. Although we might feel that a tuition grant program restricted to nonsectarian schools would serve a commendable purpose, we are nevertheless constrained to hold that, on this record, there can be no severance. The Court simply cannot assume that the Tennessee legislature would have enacted this law if it aided only those students attending nonsectarian schools, and we cannot re-write the statute the legislature passed. *See:* Sloan v. Lemon, 413 U.S. 825, at pp. 833–834, 93 S.Ct. 2982, 37 L.Ed.2d 939.

Accordingly, an Order will be entered granting the appropriate declaratory and injunctive relief.

functions would not be constitutional, provided that the statute excluded those schools where religious indoctrination so permeated the school that separation of the secular and sectarian functions would be impossible and, furhter, that the administration of the restrictions would not result in "excessive entanglement."