AMERICANS UNITED FOR the SEPARATION OF CHURCH AND STATE, a District of Columbia Corporation, Harold Steele, Joseph H. Johnston, Robert W. Bogen, and Dr. Forrest F. Evans of Nashville, Tennessee, Plaintiffs

v.

Ray BLANTON et al., Defendants,

and

Loretta P. Beard, Margaret B. Brooks, Gloria A. Brown, Brenda S. Humfleet, Arlillian Jones, Colleen Kehler, Lawrence H. Newbell, Addie Marie Reid, Raymond A. Shriver, and John W. Smythia, Defendants-Intervenor.

No. 76–227–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

May 19, 1977.

W. Gary Blackburn, Ortale, Kelley, Herbert & Crawford, and Gary E. Crawford, Trabue, Sturdivant & DeWitt, Nashville, Tenn., for plaintiffs.

Brooks McLemore, Jr., Atty. Gen., and C. Hayes Cooney, Chief Deputy Atty. Gen., Nashville, Tenn., for defendants.

Charles H. Wilson, Williams & Connolly, Washington, D.C., for defendants-intervenor.

Before PHILLIPS, Chief Judge, GRAY, Chief District Judge and MORTON, District Judge.

GRAY, Chief District Judge.

This action for a preliminary and permanent injunction and for a declaratory judgment constitutes an attack upon the constitutionality of the "Tennessee Student Assistance Program" contained in T.C.A. §§ 49–5013 et seq., a state program providing financial aid to needy college students. The plaintiffs herein consist of four citizens and taxpayers of Tennessee and a national organization incorporated in the District of Columbia; the original defendants are various state officials and members of the Tennessee Student Assistance Corporation responsible for the implementation of the program. Ten students who attend public and private institutions of higher education across the state and who also receive financial assistance under the challenged statutes were permitted to intervene as defendants.

Since this action was filed on June 23, 1976, prior to the repeal of 28 U.S.C. §§ 2281 and 2282 and the amendment of § 2284, a three-judge court was designated to hear the case pursuant to those statutes. The parties subsequently agreed to permit a single judge to take the live testimony and to rule on evidentiary matters, which procedure was to be followed by oral arguments before the three-judge panel. The case was heard on the merits pursuant to the parties' agreement from February 28, 1977, through March 3, 1977. All parties subsequently filed briefs and reply briefs as requested by the court.

In this suit brought under 28 U.S.C. §§ 1331, 1343(3), 2201 and 2202, plaintiffs seek to have the Tennessee Student Assistance Act declared unconstitutional and to enjoin the defendants from enforcing the Act on the grounds that the Act, on its face and in its application, is violative of the Establishment Clause [1] of the First Amendment to the Constitution of the United

1. Although the plaintiffs' complaint contains an allegation that the challenged statute also violates the "Free Exercise" prohibition of the First Amendment, there was no evidence presented at the hearing to support that allegation. Moreover, the plaintiffs' post-trial brief indicates that this allegation has been dropped since the only arguments presented go to allegations under the Establishment Clause.

States. Specifically, the plaintiffs complain that the Act is a law "respecting the establishment of religion" in that it provides state funds which benefit church colleges and universities "operated for religious purposes and with religious requirements for students and faculty."

This court has previously considered a similar constitutional challenge to a predecessor program, the Tennessee Tuition Grant Program, T.C.A. §§ 49–4601 *et seq.* On November 8, 1974, this court declared that the Tuition Grant Program which provided unrestricted tuition grants directly to colleges and universities, some of which were private institutions "engage[d] in substantial religious activity, violated the Establishment Clause of the First Amendment." *Americans United for the Separation of Church and State v. Dunn*, 384 F.Supp. 714 (M.D.Tenn.1974). Before the Supreme Court could consider the appeal, the statute was amended and the Supreme Court vacated the judgment and remanded the case for reconsideration in light of the amendment. 421 U.S. 958, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). Before this court had an opportunity to reconsider its decision, the Tuition Grant Program was repealed in its entirety, and the Tennessee General Assembly enacted the Tennessee Student Assistance Program now under consideration.[2]

The Tennessee Student Assistance Program, enacted as Chapter 415 of the Public Acts of 1976, now codified as T.C.A. §§ 49–5013—5021, has as its stated legislative purpose the following: " . . . providing needy students with the financial assistance necessary to attend the accredited college of their choice in Tennessee. . . . " In summary, the Act provides that state funds are to be made available to students directly, rather than to the college or university as under the former Tuition Grant Program. An award is to be made solely on the basis of a student's financial need as measured by the student's or parents' ability to pay. A student receiving aid may attend in Tennessee a public college or university, a public vocational or technical institute, or a non-public college or university accredited by the Southern Association of Colleges and Schools. The maximum award a student may receive is set at the total of tuition and fees, or $1,200, whichever is less. The Act states specifically that no effort is to be made by state officials or by the administering organization, the Tennessee Student Assistance Corporation, to influence a student's selection of institutions.

The actual operation of the Act is revealed in the rules, regulations, and procedures of the Tennessee Student Assistance Corporation (hereinafter referred to as the "Corporation") and in the testimony presented at the hearing. A student desiring aid completes an application and a financial disclosure statement. The student is ranked in priority first on his or his parents' ability to pay for his education and then on the amount of the student's need.[3] Once it is determined that a student is to receive an award, the Corporation verifies his enrollment with the institution and requests that a state warrant be issued in the student's name. Although the state warrant bears only the student's name and home address, usually all warrants for students attending a particular institution are mailed together to the institution's financial aid officer for distribution. As shown at the hearing, this method of disbursement has been adopted for two primary reasons: (1) the school term has usually begun by the time the warrants are prepared and the Corporation generally does not have the student's new school address; (2) this procedure provides a method by which the Corporation can monitor the use of the scholarship funds for "educationally related expenses only." With regard to the fiscal

2. The original case was dismissed as moot by this court on June 11, 1976, because the statute originally attacked as unconstitutional had been entirely repealed and replaced by the new act.

3. For the current year, the level of potential student and parental contribution for students receiving awards did not get above zero dollars for any one student. Priorities were then assigned according to the student's need.

accountability function which was added at the request of the state comptroller, Regulation 13 provides that, if a recipient has received credit during the registration process, he "should" give first priority to the liquidation of these debts before he uses his aid for other educationally related expenses. If he does not elect to liquidate any outstanding debts, he must provide evidence to the Corporation that he will use the funds solely for educationally related expenses before the warrant will be delivered to him. Testimony was presented at the hearing to show that, while tuition is often paid by the award, other educationally related expenses such as room rent, bus fare, clothing and health care expenses can be and have been paid with program funds, and that the formula adopted for determining the actual amount of a student's need takes into account such personal expenses. If the student should decide to transfer from one institution to another he may do so and keep his assistance, provided he notifies the Corporation and approval is given.

The Tennessee Student Assistance Program is currently funded with an appropriation from the General Assembly in the amount of $750,000 and by a federal matching grant in the same amount. Evidence established the following breakdown of award money:

PERCENTAGE OF AWARDS

|  | Private School Students | Public School Students |
|---|---|---|
| July 24, 1976 | 53% | 47% |
| November 29, 1976 | 40% | 60% |
| February 3, 1977 | 41% | 59% |

PERCENTAGE OF FUNDS

|  | Private School Students | Public School Students |
|---|---|---|
| July 24, 1976 | 73% | 27% |
| November 29, 1976 | 65% | 35% |
| February 3, 1977 | 65% | 35% |

It should be noted here that the evidence adduced established that some, but not all, of the private schools whose students benefited from this program are operated for religious purposes, with religious requirements for students and faculty and are admittedly permeated with the dogma of the sponsoring religious organization.

The First Amendment, made applicable to the states by the Fourteenth Amendment, *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), forbids a state from enacting a "law respecting the establishment of religion." In reviewing state programs attacked upon Establishment Clause grounds, the Supreme Court has continued to use the tripartite test initially set forth in the 1971 *Lemon v. Kurtzman* decision, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court recently described the test as follows:

"First, the statute must have a secular legislative purpose. . . . Second, it must have a 'primary effect' that neither advances nor inhibits religion. . . . Third, the statute and its administration must avoid excessive government entanglement with religion."

*Meek v. Pittenger,* 421 U.S. 349, 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975). *E.g., Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). This tripartite test appears to correspond with the three primary evils to religious freedom: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). The Court has decreed that the test is not to be construed rigidly but is to serve only as a guide "with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Meek v. Pittenger, supra,* 421 U.S. at 359, 95 S.Ct. at 1760. Thus, total separation between church and state is not necessary. Instead, neutrality is what is required; incidental benefits conferred on religious institutions are not proscribed; and the crucial question in any case is whether state action approaches the Establishment Clause's three main concerns. *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 771–72, 93 S.Ct. 2955.

With respect to the first prong of the test, plaintiffs concede that the legislative purpose of the Act is secular, that is, to provide needy students with the opportunity to attend the institutions of their choice. Similarly, there is no argument with respect to the third prong. No proof was presented at the hearing to show that the state is involved extensively in the operations of any religious institution. The primary if not the only interactions between the state and the institutions are in the verification and disbursement procedures. Since there is no secular use restriction placed upon the funds which flow from the student to the institution which might require extensive monitoring by the state, the plaintiffs concede that there is no impermissible entanglement. Thus, the only question remaining is whether the Tennessee Student Assistance Program has a "primary effect that neither advances nor inhibits religion." *Meek v. Pittenger, supra,* 421 U.S. at 358, 95 S.Ct. at 1760.

Although this court in *Dunn* chose to use the distinction between direct and indirect aid to religious institutions rather than the traditional three-part test, the holding in *Dunn* actually constitutes a finding that the unrestricted nature of the funds given directly to church-related institutions had a primary effect which advanced religion.[4] Similarly, the Supreme Court has used the primary effect prong to invalidate state statutes which provide direct aid to religious schools, unless such statutes contain proper safeguards against sectarian use. Thus, in *Meek v. Pittenger, supra,* the Court struck down a state statute providing for the direct loan of instructional materials to private institutions, saying the program had "the unconstitutional primary effect of advancing religion because of the predominantly religious character of the schools." *Id.,* at 363, 95 S.Ct., at 1762. In *Committee for Public Education and Religious Liberty v. Nyquist, supra,* unrestricted state funding of maintenance and repair services to private, predominantly Catholic, schools

was denounced by the Court as having "a primary effect that advances religion in that it subsidizes directly the religious activity of sectarian elementary and secondary schools." *Id.,* 413 U.S. at 774, 93 S.Ct. at 2966. In *Lemon v. Kurtzman, supra,* the Supreme Court struck down a program providing for reimbursement of certain operating expenditures to private, sectarian schools because the secular use restrictions necessary to avert the forbidden primary effect fostered excessive government entanglement with religion. *See also : Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (validating a statute giving direct grants to college-level institutions provided funds are used for secular purposes).

Plaintiffs argue first that the new Tennessee Assistance Program is actually a disguised tuition grant program, and therefore should be analyzed as in *Dunn* under the line of cases which require direct grants of aid to religious entities to be tempered by secular use restrictions. In support of this contention, the plaintiffs argue that Regulation 13, *supra,* coerces students into spending their scholarships at the institutions for fees or tuition, thus making the program indistinguishable from the former Tuition Grant Program. The court does not find this argument persuasive. In *Dunn,* this court found that the Tuition Grant Program required state funds to be used for tuition payments or fees. Indeed, the warrants under that program were issued to the institutions so the student had no choice in the matter. As noted above, the testimony at the hearing revealed that the student who receives a scholarship under the current program may use the funds for many personal needs. Even if he has an unliquidated debt at the institution he may receive his scholarship by providing evidence to the Corporation that he will use the funds for "educationally related expenses." The fact that the aid herein is not direct institutional aid as in the above cases may be shown by a

---

**4.** There was not any discussion of legislative purpose in the *Dunn* opinion. Similarly, the entanglement issue was never reached, proba-

bly because there was no secular use restriction requiring monitoring of the colleges by the state.

hypothetical situation: if the plaintiffs sought the return to the state of monies distributed under the program as in *Roemer v. Board of Public Works, supra,* the court could not require the institutions to return the funds because the money is the student's and he may use it outside the institution.

■ While it is clear that direct institutional aid to religious schools must be, at minimum, restricted to the secular activities of the recipient institutions, the law with respect to funds disbursed to students is not so clear. Depending on the facts of the particular case, the Supreme Court has held both ways, first with the so-called "child benefit cases," *infra,* and next with *Committee for Public Education and Religious Liberty v. Nyquist, supra. See also: Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973).

That student aid programs are to be distinguished, at least to some degree, from direct institutional aid programs is shown by the child benefit cases. In *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court upheld a state program calling for the reimbursement of student bus fares to parents of children attending elementary and secondary schools, regardless of the public, private, sectarian, or nonsectarian nature of the institution attended. In *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court upheld New York's statute requiring local public authorities to lend textbooks free of charge to all students in grades 7 through 12, including students attending parochial schools. Finally in *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court examined both sides of the problem and invalidated a Pennsylvania program providing instructional materials and professional services directly to private elementary and secondary schools, some of which were parochial, while it upheld a textbook loan program for children attending the same schools.

However, in *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Supreme Court decreed that there was to be no automatic immunity for a statute which channeled aid to students rather than to schools directly. In addition to invalidating an institutional maintenance and repair provision discussed above and a tax exemption provision, the Court in *Nyquist* struck down a New York statute giving partial tuition grants to low income parents whose children attended private, predominantly Catholic, elementary and secondary schools. The defendants in *Nyquist,* as in the case before this court, sought to apply the "child benefit" principles of *Everson* and *Allen* because parents, and not the institutions, were the recipients of the New York funds. In rejecting this argument, the Court said that the character of the recipients was only one factor to be considered in the analysis. Even though the state funds actually went to the parents, the Court declined to apply *Everson* and *Allen,* saying in those cases the neutral nature of the aid given to all students (bus fares and secular textbooks) provided a kind of inherent secular use restriction which was not present in the New York tuition grants.

The plaintiffs argue that the Tennessee Student Assistance Program should be analyzed according to *Nyquist,* rather than according to *Everson* and *Allen* because the money given to students for their higher education is not inherently neutral and may eventually, in certain cases, fund some religious activity at an institution. Certainly, the express holdings of these child benefit cases mandate only that aid to children attending both public and private schools is permissible when the aid is inherently secular in nature. However, to say that *Nyquist* forecasts the imminent rejection of the aid program herein is to ignore the point at which the *Nyquist* Court stopped.

■ The question herein is one which the Supreme Court specifically left open in *Nyquist.* Here, as in the child benefit cases and contrary to *Nyquist,* state funds are provided to students regardless of whether they attend a private or a public school.

Here, contrary to *Nyquist*, there is no proof showing the predominance of benefits to one religious group. The Supreme Court singled out these issues in *Nyquist* with the following note:

"Because of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (e. g., scholarships) made available generally without regard to the sectarian-nonsectarian or public-nonpublic nature of the institution benefitted. See *Wolman v. Essex*, 342 F.Supp. 399, 412–413 (S.D.Ohio), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972). Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the 'G.I. Bill,' 38 U.S.C. § 1651, impermissibly advance religion in violation of the Establishment Clause. *See also* n. 32, *supra*."

*Nyquist, supra*, at 782–83, n. 38, 93 S.Ct., at 2970.

Some discussion should be made of the citations within this footnote. First, it is significant that, within the very footnote in which the Court reserved the issue of the constitutionality of a broad-based college-level student aid program, it referred explicitly to the previous footnote that acknowledged the constitutional difference between the higher and lower levels of church-related education. *Id.*, at 777, n. 32, 93 S.Ct. 2955. Specifically, the Court made reference in the cited footnote to *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), in which a plurality of the Supreme Court declared that "college students are less impressionable and less susceptible to religious indoctrination [than younger students]." *Id.*, at 686, 91 S.Ct., at 2099. Although this distinction was made in *Tilton* with reference to the entanglement issue, the reference to the distinction in the note dealing with primary effect seems significant since none of the scholarship type programs examined fully by the Supreme Court have dealt with higher edu-

cation. Although there is no Supreme Court decision which goes directly to the issue of general scholarship funds given to college students without regard to the type of institution they attend, whether public or private, sectarian or nonsectarian, nor is there any case which examines the G.I. Bill or similar assistance programs on Establishment Clause grounds, the case which the Supreme Court in *Nyquist* cited in note 38 contains some dicta in support of the constitutionality of the Tennessee statute. This case, *Wolman v. Essex*, 342 F.Supp. 399 (S.D.Ohio), summarily *affirmed*, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972), which also invalidated a program of tuition reimbursement to parents of students attending private, elementary, and secondary schools said, in part, as follows:

"The reimbursement grant aspects of Section 3317.062 are directed only towards the parents of children who attend non-public schools. The limited nature of the class affected by the legislation, and the fact that one religious group so predominates within the class, makes suspect the constitutional validity of the statute. All the cases in which the Court has upheld legislation attacked on Establishment Clause grounds, the affected class has been substantially broader than the class affected by the Ohio statute." 342 F.Supp. at 412.

The three-judge District Court in *Wolman* went on to say that in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), all students received bus fares; in *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 106 (1968), all students received books, in *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), all non-profit institutions received tax exemptions. This three-judge court then said, in note 17 at 412:

"Defendants attempt to analogize the statute at bar to statutes which provide economic aid to R.O.T.C. students or student-veterans, regardless of the school at which they attend. This analogy must fail, for if religious schools indirectly derive benefit from such programs, this

benefit is entirely incidental and subordinate to the legitimate secular purposes underlying their enactment—purposes which have nothing whatever to do with religion."

The dicta in *Wolman* seems particularly applicable to the case at hand. The Tennessee Student Assistance Program is not unlike the G. I. Bill. The latter provides that eligible veterans are to receive an educational assistance allowance "to meet, in part, the expenses of the veteran's subsistence, tuition, fees, supplies, books, equipment, and other educational costs." 38 U.S.C. § 1681. These costs are virtually identical to those termed "educationally related expenses" under the Tennessee Student Assistance Act.

Even if the footnote in *Nyquist* and the cases cited therein are viewed merely as a reservation of a particular question by the Supreme Court and not a forecast of the probable result, action by the Court on a case from the Supreme Court of South Carolina appears to lend further support to the constitutionality of the Tennessee program. In *Durham v. McLeod*, 259 S.C. 409, 192 S.E.2d 202 (1972), the South Carolina court determined that a statute which authorized a state agency to make, insure, or guarantee loans to students, regardless of the institution of higher education which they attended, did not violate either the Constitution of the United States or the Constitution of South Carolina. No restrictions were placed on the course of study undertaken by the borrower. After noting that emphasis was on the student, that all eligible institutions were free to compete for the students, and that the aid was to higher education but not to any institution or group of institutions, the court found the act "scrupulously neutral as between religion and irreligion and as between various religions." *Id.*, 192 S.E.2d at 204. The appeal of this case to the Supreme Court was dismissed for lack of a substantial federal question, 413 U.S. 902, 93 S.Ct. 3060, 37

L.Ed.2d 1020 (1973), on the same date that *Nyquist* and the block of related cases were decided (June 25, 1973). Under recent Supreme Court opinions, *Hicks v. Miranda*, 422 U.S. 332, 343–44, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Colorado Springs Amusements, Ltd. v. Rizzo*, 408 U.S. 913, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976) (Brennan dissenting from a denial of certiorari), such summary decisions of the Supreme Court on appeals are conclusive precedents regarding constitutional challenges to like statutes, " 'except when doctrinal developments indicate otherwise,' " *Hicks v. Miranda, supra*, 422 U.S. at 344, 95 S.Ct., at 2289 quoting from *Port Authority Bondholders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263, n. 3 (2 Cir. 1967), or where the Court has noted probable jurisdiction in a similar case, *Steinberg v. Fusari*, D.C., 364 F.Supp. 922, *vacated on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, *rehearing denied*, 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433.

The plaintiffs argue that the *Durham* case should not control here since no public money or credit was to be used in South Carolina for the loans and since loans are inherently different from outright scholarships. The court is not persuaded by this attempt to distinguish *Durham*. For purposes of Establishment Clause analysis, if a state loan program that provides money to students and perhaps makes it possible for a student to attend a religious college of his choice does not present a substantial question of sponsorship or financial support of religious institutions, then it does not appear that a state scholarship program should be viewed differently.

■ In the instant case, as in *Durham*, the emphasis of the aid program is on the student rather than the institution, and the institutions are free to compete for the students who have money provided by the program. No one religion is favored by the program, nor are private or religious institutions favored over public institutions.[5]

---

5. Plaintiffs incorrectly contend that the program provides an incentive to attend a private, rather than a public, college. While at least

one of the intervenors testified at the hearing that the student aid enabled him to attend a private school, statistics offered at trial tended

In enacting the Tennessee Student Assistance Program, the Tennessee General Assembly sought to provide needy students with the opportunity to attend the higher education institution of their choice, be it public, private, sectarian, or nonsectarian. To ensure that the neutral purpose would not be compromised, the General Assembly enacted a student aid program rather than an institutional aid program. The statute passes the relevant three-pronged inquiry, and the Court finds that the program, on its face and in its application, does not offend the values protected by the Establishment Clause.

An appropriate judgment will enter.

to discount this behavior. The statistics shown above indicate that, as of February 3, 1977, some 59 percent of the students receiving aid attended public institutions. Moreover, testimony at the hearing established that private college tuition averages in excess of the maximum student grant under the program, $1,200.

A student at a public institution who qualifies for aid will have his entire tuition paid. Thus, if the program provides an incentive to select one college over the other, the incentive does not appear to be in favor of the private institution.