Commonwealth of Pennsylvania, Department of Education *v.* The First School, Appellant.

Argued June 5, 1975—Reargued September 10, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*William B. Ball,* with him *Ball & Skelly,* for appellant.

*J. Justin Blewitt, Jr.,* Deputy Attorney General, with him *Lawrence Silver,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE BLATT, December 12, 1975:

This is an action in which The First School tests the viability of a statute held to be at least in part unconstitutional by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U. S. 602 (1971) (Lemon I).

The statute in question is the Nonpublic Elementary and Secondary Education Act[1] (Act 109)· which authorizes the Commonwealth to reimburse nonpublic schools for their actual expenditures for teachers' salaries, textbooks, and other instructional materials. In *Lemon I* the court reviewed Act 109 and a similar statute of Rhode Island and held "that both statutes are unconstitutional" because "the cumulative impact of the entire relationship [between secular and religious educational functions] arising under the statutes in each state involves excessive entanglement between government and religion." *Lemon I* at 607 and 614. The court, however, remanded the case to the United States District Court for the Eastern District of Pennsylvania for further proceedings consistent with the opinion, and, upon remand, the District Court carefully drafted an order proscribing payments

---

1. Act of June 19, 1968, P. L. 232, 24 P. S. §5601 et seq.

"to any school which is church related, controlled by a religious organization or organizations, or has the purpose of propagating and promoting a particular religious faith and conducts its operations to fulfill the purpose." *Lemon v. Kurtzman,* 348 F. Supp. 300, 301 n. 1 (E.D. Pa. 1972).

The Supreme Court affirmed this limited order in *Lemon v. Kurtzman,* 411 U. S. 192 (1973) (Lemon II).[2]

The First School contends that the ruling by the District Court and approved by the Supreme Court in *Lemon II* indicates that Act 109 has been declared unconstitutional only insofar as it may have applied to sectarian schools. The First School, therefore, being a nonpublic and nonsectarian school, has applied for funding pursuant to the Act. The Department of Education (Department), however, maintains that Act 109 is unconstitutional in its entirety and has consequently refused The First School's application for funding. This appeal by The First School followed.

A careful reading of the Supreme Court's opinion in *Lemon I* and of its subsequent opinion in *Lemon II* fails to provide any definitive indication as to whether or not the court considered the continuing viability of Act 109 as it pertains to nonpublic, nonsectarian schools. In both cases the court stressed its concern, however, about the potential excessive entanglement between government and religion that attends such statutes as Act 109. The District Court, therefore, when acting under the order remanding this case to it, proscribed payments to nonpublic sectarian schools only, and it appears that the Act 109 funding provisions were considered by that court to have continuing validity as to nonsectarian schools. We

---

2. The primary issue in *Lemon II* was whether or not *Lemon I* should be applied prospectively or retroactively so as to permit reimbursement by the state to those institutions which would otherwise have been entitled to payments under the act prior to the decision in *Lemon I.*

believe, too, as the District Court evidently did, that there was no intent by the Supreme Court to rule Act 109 unconstitutional as applicable to situations where the prohibited church-state entanglement was not involved. What we must determine, however, is whether or not Act 109 is reasonably capable of severability so as to remain viable for nonpublic, nonsectarian institutions.

The statute itself includes a general severability clause which provides:

> "If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more *of its applications,* the part remains in effect *in all valid applications that are severable from the invalid applications."* Section 9 of Act 109, 24 P. S. §5608. (Emphasis added.)

Moreover, the applicable rules of statutory construction favor severability.

> "The provisions of every law shall be severable. If any provision of a law is found by a court of record to be unconstitutional and void, the remaining provisions of the law shall, nevertheless, remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so depend upon, the void provision, that it cannot be presumed the Legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." Section 55 of the Statutory Construction Act, Act of May 28, 1937, P. L. 1019.

The Department, relying upon *Sloan v. Lemon,* 413 U. S. 825 (1973), argues that the provisions of Act 109 which allow for reimbursement of sectarian schools are essentially and inseparably connected with the provisions allowing for the reimbursement of nonsectarian schools

and that the Legislature would not have enacted a statute solely to benefit nonpublic nonsectarian schools. Act 109, of course, did not contain separate provisions for support of sectarian and nonsectarian schools but rather it provided provision for support of nonpublic schools generally. The analogy to *Sloan*, therefore, is compelling because the same was true of the Parent Reimbursement Act for Nonpublic Education[3] (Act 92) under consideration there, and Act 92 had provided funds to reimburse parents for a portion of tuition expenses incurred in sending their children to nonpublic schools. The litigants in *Sloan* argued that Act 92 should be treated so as to permit continued viability for the benefit of parents who send children to nonpublic nonsectarian schools but the District Court there, which had first ruled upon the case, reasoned that "in view of the fact that so substantial a majority of the law's designated beneficiaries were affiliated with religious organizations, it could not assume that the state legislature would have passed the law to aid only those attending the relatively few nonsectarian schools. . . ." *Sloan, supra* at 834. It was, therefore, held to be nonseverable. The Supreme Court on appeal affirmed that ruling and said that it had "been given no reason to upset the District Court's conclusion." *Sloan, supra* at 834. However, while it is true that sectarian schools accounted for approximately 96% of the nonpublic schools likely to receive benefits under Act 109 while nonsectarian schools accounted for only 4% of the likely beneficiaries, Act 109 is unlike Act 92 in that it is readily capable of being administered along a sectarian-nonsectarian dichotomy. The reimbursements under Act 109 go directly to the schools rather than to parents, and, in fact, the evidence suggests that the Act was originally administered with this dichotomy in mind. Severance of sectarian schools from the application of Act 109, there-

---

3. Act of August 27, 1971, P. L. 358, 24 P. S. §5701 et seq.

fore, could still allow the Act to remain complete and fully capable of execution as to nonsectarian schools. We are uncertain, of course, as to whether or not the legislature would not have enacted Act 109 solely to benefit nonsectarian schools, and yet we cannot conclude that it would not have done so. We believe, therefore, that inasmuch as the law favors severability and Act 109 reasonably permits severability, it is indeed severable.

It is next argued that Act 109 was impliedly repealed by the passage of Act 194[4] and Act 195[5]. These acts enabled children attending nonpublic schools to receive auxiliary services and textbooks or instructional materials through tax funds of the Commonwealth. It is argued that the subject matter of these later enactments covers the same ground covered by Act 109 and, therefore, that Acts 194 and 195 were intended as a substitute for Act 109 and consequently repealed it. The general rules of statutory construction as they relate to implied repealer provide as follows:

"(a) Whenever a statute purports to be a revision of all statutes upon a particular subject, or sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statute, such statute shall be construed to supply and therefore to repeal all former statutes upon the same subject.

"(b) Whenever a general statute purports to establish a uniform and mandatory system covering a class of subjects, such statute shall be construed to supply and therefore to repeal pre-existing local or special statutes on the same class of subjects.

"(c) In all other cases, a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable." 1 Pa. C. S. §1971.

---

4.   Act of July 12, 1972, P. L. 861, *as amended,* 24 P. S. §9-972.

5.   Act of July 12, 1972, P. L. 863, *as amended,* 24 P. S. §9-973.

It is readily apparent that Acts 194 and 195 were not enacted as a revision of all statutes covering aid to nonpublic schools. Such intent is nowhere suggested in the text of either Act. And, as to Act 109, nothing in Acts 194 and 195 leads us to believe that the General Assembly intended therein to set up a general or exclusive system of providing aid to nonpublic education. Act 109 specifically provides that nonpublic schools may request reimbursement from the Commonwealth to pay for the purchase of secular educational service, consisting of courses solely in the subjects of mathematics, modern languages, physical science, and physical education. Secular educational service, of course, includes teachers' salaries, textbooks, and other instructional materials of a secular nature. Act 194, on the other hand, provides that the intermediate units of the Commonwealth School System shall provide in kind auxiliary services to nonpublic school children within the unit. Auxilary services include such services as guidance, counseling and testing service; psychological services; services for exceptional children; remedial and therapeutic services; and speech and hearing services among others. Act 195 provides that the Secretary of Education shall have the power to loan textbooks upon request to nonpublic school pupils and to loan other instructional materials upon request to nonpublic schools for use by nonpublic school children. Although these Acts may involve some duplication of coverage, they are not mutually exclusive or irreconcilable, and they would appear only to be an additional effort by the General Assembly to provide increased public aid to nonpublic education. Certainly there is no apparent intent to eliminate whatever aid the General Assembly had already made available for this purpose.

We, therefore, issue the following

## ORDER

AND NOW, this 12th day of December, 1975, the decision of the Secretary of Education denying the ap-

plication of The First School for reimbursement pursuant to the Act of June 19, 1968, P. L. 232 (Act 109), is hereby reversed and the Secretary is hereby directed to process the said application in accordance with the statute and all other applicable regulations.

---

DISSENTING OPINION BY JUDGE ROGERS:

I respectfully dissent.

The First School, a nonpublic nonsectarian school, seeks reimbursement for expenditures for teachers' salaries, text books and other instructional materials pursuant to the Act of June 19, 1968, P.L. 232, 24 P.S. §5601 et seq. (Act 109). The Supreme Court held Act 109 to be unconstitutional as involving an excessive entanglement of government and religion, emphasizing that 96% of the nonpublic school pupils sought to be benefited were enrolled in church schools. *Lemon v. Kurtzman,* 403 U.S. 602 (1971), (*Lemon* I). The Supreme Court remanded the case to the District for the issuance of appropriate orders. The District Court enjoined future payments under the Act to nonpublic sectarian schools but permitted the State to reimburse nonpublic sectarian schools for services provided before the Supreme Court's decision at 403 U.S. 602 (1971). The Supreme Court affirmed this order. *Lemon v. Kurtzman,* 411 U.S. 192 (1973), (*Lemon* II). While the District Court's order deals only with payments to sectarian schools, neither that order nor either Supreme Court decision says anything about reimbursement to nonsectarian schools.

In *Sloan v. Lemon,* 413 U.S. 825 (1973), the Supreme Court of the United States struck down the Act of August 27, 1971, P.L. 358, *as amended,* 24 P.S. §5701 et seq. (Act 92), which provided tuition reimbursements to parents sending their children to nonpublic schools.

The majority has concluded that the provisions of the Act 109, declared to be unconstitutional by the United

States Supreme Court, are severable and that nonpublic nonsectarian schools may continue to be reimbursed for instructional expenses. My disagreement with the majority stems from my conclusion that "the valid provisions of . . . [Act 109] . . . are so essentially and unseparably connected with, and so depend upon, the void provisions that it cannot be presumed that the General Assembly would have enacted the remaining valid provisions without the void one." Statutory Construction Act of 1972, 1 Pa. C.S. §1925. The named objects of State bounty provided by Act 109 are "nonpublic schools," and no distinction between nonpublic sectarian schools on the one hand, and nonpublic, nonsectarian schools on the other, appears anywhere in the Act. The history of *Lemon v. Kurtzman, (Lemon* I and II), as mentioned, reveals that 96% of the students attending nonpublic schools in Pennsylvania attend sectarian schools. Clearly the impetus for the enactment of Act 109 and the other Acts of the General Assembly providing public support to nonpublic schools derived entirely from the interest of persons who send their children to nonpublic sectarian schools. It is simply unrealistic to presume that the Legislature would have provided aid to schools educating but four per cent of the nonpublic school students of the Commonwealth, leaving without benefit the schools which educate the remaining 96% of such children, whose understandable desire to have public subsidy caused the Act to be passed.

Further, in *Sloan v. Lemon,* 413 U.S. 825 (1973), the Supreme Court of the United States was asked to find the provisions of the Act 92, providing tuition reimbursement, to be severable as between the parents of students attending sectarian and those attending nonsectarian schools.

The court declared:

"Appellants ask this Court to declare the provisions severable and thereby to allow tuition reim-

bursement for parents of children attending schools that are not church-related. If the parents of children who attend nonsectarian schools receive assistance, their argument continues, parents of children who attend sectarian schools are entitled to the same aid as a matter of equal protection. The argument is thoroughly spurious. In the first place, we have been shown no reason to upset the District Court's conclusion that aid to the nonsectarian school could not be severed from aid to the sectarian. *The statute nowhere sets up this suggested dichotomy between sectarian and nonsectarian schools, and to approve such a distinction here would be to create a program quite different from the one the legislature actually adopted.* . . . Even if the Act were clearly severable, valid aid to nonpublic, nonsectarian schools would provide no lever for aid to their sectarian counterparts. The Equal Protection Clause has never been regarded as a bludgeon with which to compel a State to violate other provisions of the Constitution. Having held that tuition reimbursements for the benefit of sectarian schools violate the Establishment Clause, nothing in the Equal Protection Clause will suffice to revive that program." 413 U.S. at 834. (Emphasis supplied.)

Since, as I have mentioned, Act 109 "nowhere sets up this suggested dichotomy between sectarian and nonsectarian schools, and to approve such a distinction would be to create a program quite different from the one the Legislature actually adopted," the appellant's argument in this case is also, to use the Supreme Court's word, spurious.

I would affirm the Secretary of Education's decision.

Judge WILKINSON joins in this dissent.