March 16, 1978

## 78-19 MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Constitutional Law—First Amendment— Establishment Clause—Nonpublic Elementary and Secondary Schools— Tuition—Tax Credits

You have asked for our opinion concerning the constitutionality, under the Establishment Clause of the First Amendment, of providing either tax credits or grants for tuition payments to nonpublic elementary and secondary schools. You referred to two specific proposals providing such grants or credits: the Packwood-Moynihan bill, S. 2142, which would give limited income tax relief in the form of a credit for tuition payments to nonpublic schools; and the extension of the Basic Educational Opportunity Grant program to include nonpublic elementary and secondary school education.

In our opinion, under existing Supreme Court decisions both proposals would violate the First Amendment guarantee against establishment of religion. The controlling decisions on tuition grants and credits for nonpublic elementary and secondary education are *Committee for Public Education* v. *Nyquist*, 413 U.S. 756 (1973), and *Sloan* v. *Lemon, 413 U.S. 825 (1973)*, a companion case.

In *Nyquist*, the Court invalidated a New York tuition reimbursement and tax relief plan. The plan provided limited tuition reimbursements to low-income families with children attending nonpublic elementary and secondary schools. Families failing to qualify for tuition reimbursement were allowed tuition tax credits in varying amounts depending upon adjusted gross income. The Court found both facets of the program unconstitutional under the three-part Establishment Clause test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971):

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive entanglement with religion." [Citations omitted.]

77

The Court acknowledged that the purposes of the State in enacting the measures—to preserve a healthy, safe educational environment for all schoolchildren, to promote pluralism and diversity in education, and to prevent further overburdening of the public school system—were secular and not inappropriate legislative goals. It held, however, that the tuition grants and credits failed the second prong of the test because a primary effect of the plan was to aid religious education. The Court noted additionally that the plan created the prospect of politically divisive church-state entanglement. Adoption of programs assisting sectarian education would generate ongoing controversy along religious lines over continuing or enlarging available relief.

In *Sloan,* the Court held that a Pennsylvania tuition reimbursement program was constitutionally indistinguishable from the New York program invalidated in *Nyquist.* Since the Pennsylvania program had the effect of advancing religion, it, too, infringed upon the Establishment Clause guarantee.

The Packwood-Moynihan bill provides an income tax credit for tuition payments to elementary and secondary schools as well as vocational schools, colleges, and universities.[1] The amount of the credit is 50 percent of tuition up to a total of $500 per student. If the credit to which the taxpayer is entitled exceeds his tax liability, the difference is refunded to him. We believe that the tax relief provided in the bill for tuition payments to nonpublic elementary and secondary schools falls within the scope of *Nyquist.*

Although we have considered carefully possible arguments distinguishing the Packwood-Moynihan tax credit from the New York tax relief program struck down by the Supreme Court, we do not believe the differences are of constitutional dimension. It might be argued that the facially neutral, broad-based tax relief provided in the bill prevents it from having a "primary effect" of advancing religion. According to that argument, aid accruing to nonpublic elementary and secondary schools would be only "incidental" to an otherwise neutral plan, and therefore would be constitutionally permissible under *Nyquist.* 413 U.S. at 771, 782 n. 38; *Walz* v. *Tax Commission,* 397 U.S. 664 (1970). A realistic appraisal of the tax credits proposal, however, indicates that it is not so neutral or broad based as it might appear. In analyzing the effect of the tuition tax credit under the Establishment Clause, it is necessary to separate the elementary and secondary school and higher education components of the bill.[2] Recent Supreme Court decisions have consistently distinguished aid to college-level institutions from aid to lower-level schools, pointing out that

---

[1]We understand that the bill as reported out of the Senate Finance Committee was amended in a number of ways but that the basic tax credit provisions remain unchanged.

[2]We understand that a severability clause was added to the bill as recently reported out of the Senate committee.

religiously affiliated institutions at the college level are less often so "pervasively sectarian" as schools educating younger students and that older students are generally less impressionable. *See, e.g., Roemer* v. *Board of Public Works of Maryland,* 426 U.S. 736 (1976); *Hunt* v. *McNair,* 413 U.S. 734 (1973); *Committee for Public Education* v. *Nyquist,* 413 U.S., at 777, n. 32; *Tilton* v. *Richardson,* 403 U.S. 672, 685 (1971).

Once the focus is on elementary and secondary school tuition credits alone, it is evident that the effect on sectarian education is not merely incidental. Not only would the credits benefit institutions whose role is to emphasize religious training and beliefs, but they would also benefit sectarian schools in significantly larger numbers than nonsectarian schools. The high percentage of sectarian elementary and secondary schools in New York State—approximately 85 percent of all nonpublic schools—was one factor influencing the Court's decision in *Nyquist.*

Current statistics on nonpublic schools nationally show that nearly 17 percent of the Nation's elementary and secondary schools are nonpublic. Of that percentage, 85 percent are religiously affiliated. U.S. Department of Health, Education, and Welfare, National Center for Education Statistics, Nonpublic School Statistics, 1966-77. According to the most recent statistics available, 87.5 percent of nonpublic schools at the elementary level and 70.2 percent of nonpublic schools at the secondary level are sectarian.[3] U.S. Department of Health, Education, and Welfare, National Center for Education Statistics, "Statistics of Nonpublic Elementary and Secondary Schools, 1970-71." Although sectarian secondary schools do not dominate nonpublic education to the same extent as sectarian elementary schools, we believe that their number is sufficiently substantial so that no meaningful distinction between credits for elementary and secondary schools can be drawn.

It might be argued that the availability of credits for public elementary and secondary school tuition under the provisions of the bill would significantly affect those statistics. The Court has repeatedly made the point, however, that the actual impact or "effect" of the program is the controlling determinant, not its hypothetical consequences. The simple fact is that most public schools are supported by State funds, not tuition payments, and there is no evidence of which we are aware that the structure of State funding is likely to change radically as a result of this legislation. Thus, it appears that the tax credits here,

---

[3]Statistics showing the breakdown of schools at the elementary and secondary school levels for the 1976-77 academic year have not yet been completed. Preliminary statistics on student enrollment during 1976-77 are available, however, which, although compiled using a somewhat different format than earlier statistics, suggest that the percentages of nonpublic schools have not changed radically over the last 6 years.

like the tax reductions in *Nyquist*, have a primary effect of benefiting parents of children attending sectarian, nonpublic schools.[4]

The neutrality argument deserves elaboration because it is the most plausible basis for distinguishing the bill from the statute at issue in *Nyquist* and *Sloan*. The argument rests primarily on language in Mr. Justice Powell's opinion for the Court in *Nyquist*, in which he distinguished *Walz* v. *Tax Commissioner*, 397 U.S. 664 (1970). In *Walz*, the Court upheld the constitutionality of property tax exemptions for churches. The *Nyquist* Court distinguished the earlier case on several grounds, one of which was the broad-based and neutral class of property exempted:

> The exemption challenged in *Walz* was not restricted to a class composed exclusively or even predominantly of religious institutions. Instead, the exemption covered all property devoted to religious, educational, or charitable purposes. As the parties here must concede, tax reductions authorized by this law flow primarily to the parents of children attending sectarian, nonpublic schools. Without intimating whether this factor alone might have controlling significance in another context in some future case, it should be apparent that in terms of the potential divisiveness of any legislative measure the narrowness of the benefited class would be an important factor. [413 U.S., at 794]

At the end of the above discussion the Court added a footnote referring back to a similar point made earlier, which stated:

> [W]e need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present case from a case involving some form of public assistance (*e.g.*, scholarships) made available generally without regard to the sectarian-nonsectarian or public-nonpublic nature of the institution benefited. [413 U.S., at 783 n. 38]

An argument could be made, on the basis of those remarks, that the present bill is valid because it would benefit a large, diverse class and would not in its

---

[4]We should emphasize that the Court in *Nyquist* made clear that a law could offend the Establishment Clause even if aid to religion was not *the* primary effect but was only one of several consequences of that law. An additional New York State program considered by the Court in *Nyquist* provided "maintenance and repair grants" to nonpublic schools, limiting those grants to 50 percent of the maintenance and repair costs of public schools. Even though it was clear that most of the funds would be used for nonsectarian purposes, the Court held the grants unconstitutional. The flaw in the program was that it provided no means of excluding State funds from benefiting religion. 413 U.S., at 778-80. Possibly a clearer example may be found in the Federal higher education construction grants involved in *Tilton* v. *Richardson, supra*. In that case, even though it was clear that the constructed facilities would be used predominantly for secular purposes, the fact that they could be used for sectarian purposes 20 years after their construction was enough to render that portion of the law unconstitutional in the unanimous view of the Court. Indeed, the Court struck the provision down on the ground that the 20-year limitation "will *in part* have the effect of advancing religion," 403 U.S., at 683 [emphasis added], not because that effect was predominant. No one could have claimed there that the law's central effects were secular. Only when the sectarian effects may be characterized fairly as merely "incidental" can a funding program which benefits religion be upheld.

operation draw distinctions based upon the religious character of institutions. This contention may be maintained, however, if no line is drawn between elementary and secondary school and higher education tuition credits. We think the bill cannot be viewed in this manner for several reasons. First, as we noted above, the Supreme Court has repeatedly drawn a distinction between grants to sectarian colleges and universities and similar grants at the precollege level. Second, the history of education in this country has evolved along lines distinguishing between universal free and mandatory public education at the elementary and secondary level and nonmandatory, and rarely free, educational offerings by the States at the higher education level. Because of these differences, the effect of the bill's tax credit provisions will be decidedly different for parents of public schoolchildren than for those whose offspring are enrolled in colleges and universities. Third, comments and testimony submitted on the bill leave little doubt that Congress is aware of the differences between tuition tax credits for the families of college students and credits for those families of elementary and secondary schoolchildren who desire a private school alternative.[5] *See, e.g.,* letter dated December 21, 1977, to Senators Packwood and Moynihan from Professor Freund of Harvard Law School.

Finally, we do not think that broadening the class of beneficiaries to mesh elementary and secondary students with college and university students obscures the fact that one of the "primary effects" of the bill is to aid sectarian education. The Court has stated clearly that to constitute a "primary effect" a law need not result exclusively or even predominantly in religious benefits. Rather, a primary effect can exist even where there are any number of other appropriate and praiseworthy consequences of the legislation. Given these considerations, we do not think it reasonable to contend that the provisions of the bill pertaining to tuition for elementary and secondary schools would survive on "neutrality" grounds.[6]

An alternative argument in support of the bill is that Federal tax relief is fundamentally different from similar State measures. If the States promote the education of elementary and secondary schoolchildren through the provision of free public schools, the primary effect of any State tax relief for elementary and secondary school tuition is to assist the sectarian schools which make up the bulk of educational institutions charging tuition. It is argued that the Federal Government, on the other hand, does not provide elementary and secondary

---

[5]We note that the report of the Senate Finance Committee on the bill, as amended, separately discusses elementary and secondary school tuition credits and college tuition credits. S. Rept. No. 95-642, 95th Cong., 2d sess. 2-3 (1978).

[6]Supporters of the bill who seek to distinguish *Nyquist* make one other generalized claim. The assertion is made that the Court's precedents in the Establishment Clause area of First Amendment law have been so flexible and unpredictable that little significance may be attached to recent holdings. In our view that reading of the cases is unfair. Certainly, as the Court has freely acknowledged, the lines are not easy ones to draw. The Court has, however, developed—and adhered to—the three-part test outlined at length 8 years ago in *Lemon* v. *Kurtzman, supra.* That test has commanded the votes of every Justice of the Court with the exception of Justices White and Rehnquist. Moreover, we know of no reason to argue that *Nyquist* and *Sloan,* the precedents directly pertinent here, are of doubtful vitality.

schooling, and can attempt effectively to promote the education of schoolchildren only through generally applicable tax relief measures. This argument ignores the focus of *Nyquist*. Although the purpose underlying a tax-benefit plan may be both secular and laudable, the effect of the plan may be impermissibly to advance or inhibit religion. As we have said, it is our opinion that the effect upon nonpublic elementary and secondary schools of the Packwood-Moynihan tax credit would be constitutionally indistinguishable from the effect of the *Nyquist* tax reduction legislation.[7]

Our comments with respect to the proposed extension of the Basic Educational Opportunity Grant (BEOG) program[8] to include nonpublic elementary and secondary education follow the same vein. Under the present program grants are awarded to students enrolled at institutions of higher learning on the basis of need. The amount of the grant is determined by a number of factors including family size, income, and tuition costs. The proposed extension would make those grants available to pupils in nonpublic elementary and secondary schools as well. Both *Nyquist* and *Sloan* hold that tuition grants for nonpublic elementary and secondary education infringe upon the Establishment Clause guarantee if a primary effect of the grant or reimbursement plan is to aid sectarian schools. Given the predominantly sectarian affiliation of nonpublic elementary and secondary schools nationally, any broadening of the BEOG program into elementary and secondary education would appear to have a primary effect nearly identical to the tuition reimbursement plans invalidated in *Nyquist* and *Sloan*.

Finally, we note that the problem of entanglement in the form of politically divisive activity described by the Court in *Nyquist* would exist under both tuition relief proposals. Insofar as the programs have a primary effect upon sectarian elementary and secondary schools, controversy is predictable. As the Court stated:

> [W]e know from long experience with both Federal and State Governments that aid programs of any kind tend to become entrenched, to escalate in cost, and to generate their own aggressive constituencies. . . . In this situation, where the underlying issue is the deeply

[7]We believe, however, that the Packwood-Moynihan tax credit would be constitutional with respect to college and university tuition. It appears that the benefits of a higher education tax credit would flow to a broad class of individuals, and not, as with elementary and secondary school credits, primarily to individuals affiliated with sectarian institutions. As the Court noted in *Nyquist*, nothing in its decision compels the conclusion that a generally available form of education assistance, such as the ''G.I. Bill,'' 38 U.S.C. § 1651, impermissibly advances religion. 413 U.S., at 783, n. 38. Our views on the constitutionality of the college tuition tax credit are buttressed by the Court's recent summary affirmance of a case involving an Establishment Clause challenge to a Tennessee program providing grants to students in public and private colleges. *Americans United for the Separation of Church and State* v. *Blanton*, 434 U.S. 803, (1977), *aff'g* 433 F. Supp. 97 (M.D. Tenn. 1977). The district court, relying in part on the *Nyquist* footnote mentioned above, concluded that the broad Tennessee college scholarship program, with its emphasis on the student rather than the institution, did not have the effect of favoring private or sectarian institutions over public institutions and therefore did not compromise Establishment Clause values. We believe that the same rationale is applicable to Federal tax credits for college and university tuition.

[8]That program is set out at 20 U.S.C. § 107a (1975 Supp.), as amended by 20 U.S.C.A. 1070a (1976).

emotional one of Church-State relationship, the potential for seriously divisive political consequences needs no elaboration. [413 U.S. at 797]

In conclusion, it is our opinion that both the proposed extension of the BEOG and the provisions of the Packwood-Moynihan bill which would provide relief for tuition payments to nonpublic elementary and secondary schools are unconstitutional under the decisions of the Supreme Court in *Nyquist* and *Sloan*.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*