# Congressional Disapproval of AWACS Arms Sale

The provision in § 36(b) of the Arms Export Control Act for congressional disapproval by concurrent resolution of a proposed sale of military equipment is unconstitutional under the Presentation Clauses of the Constitution; since a resolution of disapproval under § 36(b) has the force and effect of law, the President must be given the opportunity to approve or veto such congressional action.

The legislative veto in § 36(b) impermissibly intrudes on the President's authority to execute the laws and to conduct the Nation's foreign relations, in violation of the principle of separation of powers.

The legislative veto in § 36(b) is severable from the other provisions of the Arms Export Control Act, since nothing in the legislative history of that Act indicates an intent to deprive the President altogether of his power to transact foreign military sales.

The "report-and-wait" provision in § 36(b), which requires that the President report arms sales to the Congress and delay the transaction for a 30-day period pending congressional action to disapprove the sale through the enactment of legislation, is not unconstitutional.

The President could, consistent with the longstanding position of the Executive Branch and with the express statements of his two immediate predecessors, choose to treat a congressional resolution of disapproval under § 36(b) as a legal nullity. Alternatively, the President could avoid the necessity to submit a proposed arms sale for congressional review by invoking the emergency provision of § 36(b), or by making a finding that the sale is vital to the national security interests of the United States under the International Security and Development Cooperation Act of 1980.

October 28, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

On October 1, 1981, the President transmitted to Congress a certification of intent to offer certain military equipment, including Airborne Warning and Control System (AWACS) aircraft, to the government of Saudi Arabia. Section 36(b) of the Arms Export Control Act, 22 U.S. C. § 2776(b) (1976 and Supp. IV 1980), provides that the letter of offer shall not be issued "if the Congress, within thirty calendar days after receiving such certification, adopts a concurrent resolution stating that it objects to the proposed sale." The House of Representatives has already voted to disapprove the sale, and there is significant possibility that the Senate will also adopt a resolution of disapproval. This memorandum discusses several theories under which we believe the President could sell the equipment to Saudi Arabia notwithstanding the adoption by Congress of a concurrent resolution disapproving the sale.

308

## I. Constitutional Invalidity of the Legislative Action

This Administration, like all previous administrations since 1934, has taken the position that so-called legislative vetoes which interfere with the President's constitutional responsibilities are unconstitutional. We believe that § 36(b) is such a provision. It purports to authorize congressional action having the force and effect of legislation without providing for presentation to the President for his approval or veto, as required by Article I, § 7, clauses 2 and 3 of the Constitution. Moreover, § 36(b) represents a particularly severe congressional intrusion into the prerogatives vested in the President by the Constitution to execute the law and to conduct the Nation's foreign relations.

For these reasons, we believe that the President would have discretion to proceed with the proposed sale despite a congressional veto. Of course, the President could, as a matter of policy, determine not to issue the letter of offer in view of the congressional expression of disapproval.

### A. History of § 36(b)

Every President who has commented on § 36(b) has strongly opposed its provision for a congressional veto of arms sales to foreign governments. The Foreign Military Sales Act of 1968, Pub. L. No. 90–629, 82 Stat. 1320, gave the President broad discretion to sell defense articles and services to friendly countries for their internal security, self-defense, and other needs. There was no provision for congressional disapproval of proposed sales. The predecessor of § 36(b) was first enacted in 1974 as part of omnibus foreign assistance legislation. Foreign Assistance Act of 1974, Pub. L. No. 93–559, § 45, 88 Stat. 1795, 1814. President Ford signed the legislation without commenting on the congressional disapproval provision. 11 Weekly Comp. Pres. Doc. 3 (Dec. 30, 1974).

Two years later, President Ford vetoed a bill re-enacting the amendment, modifying it in several minor respects, and incorporating further legislative veto provisions. President Ford stated that the congressional veto provisions of the bill would erode "the basic distinction between Legislative and Executive functions":

> Such legislation would pose a serious threat to our system of government, and would forge impermissible shackles on the President's ability to carry out the laws and conduct the foreign relations of the United States. The President cannot function effectively in domestic matters, and speak for the nation authoritatively in foreign affairs, if his decisions under authority previously conferred can be reversed by a bare majority of the Congress. Also, the attempt of Congress to become a virtual co-administrator

in operational decisions would seriously detract it from its proper legislative role. Inefficiency, delay, and uncertainty in the management of our nation's foreign affairs would eventually follow.

12 Weekly Comp. Pres. Doc. 828, 829 (May 7, 1976).

Thereafter, when Congress presented to him a revised version of the bill which eliminated several congressional veto provisions, President Ford signed it into law but specifically stated his reservations about the remaining veto provision in § 36(b). The President stated:

> I am especially pleased to note that with one exception the constitutionally objectionable features of [the bill], whereby authority conferred on the President by law could be rescinded by the adoption of a concurrent resolution by the Congress, have all been deleted. . . . The manifest incompatibility of such provisions with the express requirements of the Constitution that legislative measures having the force and effect of law be presented to the President for approval, and if disapproved, be passed by the requisite two-thirds majority of both Houses was perhaps the single most serious defect of the previous bill and one which went well beyond security assistance and foreign affairs in its implications. Moreover, such provisions would have purported to involve the Congress in the performance of day-to-day executive functions in derogation of the principle of separation of powers, resulting in the erosion of the fundamental constitutional distinction between the role of the ,Congress in enacting legislation and the role of the Executive in carrying it out.
>
> The one exception to this laudable action is the retention . . . of the 'legislative veto' provision regarding major governmental sales of military equipment and services. This is not a new provision, but has been in the law since 1974. To date, no concurrent resolution of disapproval under section 36(b) has been adopted, and the constitutional question has not been raised directly. Although I am accepting [the bill] with this provision included, I reserve my position on its constitutionality if the provision should ever become operative.

12 Weekly Comp. Pres. Doc. 1104, 1105 (July 1, 1976).

President Carter expressed similar views when an enrolled bill entitled the "International Security Assistance Act of 1977" was presented to him for signature. That bill amended the Arms Export Control Act to apply the § 36(b) veto procedure to certain other transactions and to add a congressional veto to third-party transfers. Pub. L. No. 95–92,

§§ 16, 20, 91 Stat. 614, 622, 623. President Carter stated that these provisions would:

> let Congress prevent Presidential action authorized under law simply by adopting a concurrent resolution of disapproval. Such provisions raise major constitutional questions, since Article I, § 7 of the Constitution requires that congressional action having the force and effect of law be presented to the President for approval. These provisions also have the potential of involving Congress in the execution of the laws, a responsibility reserved for the President under the Constitution. I am approving [the bill] because of its importance to our foreign relations and national security, but I must express my deep reservations about these two provisions and my intention to preserve the constitutional authority of the President.

13 Weekly Comp. Pres. Doc. 1185, 1186 (Aug. 5, 1977).

### B. Constitutionality of the § 36(b) Procedure

The possible rejection by Congress of the President's decision to sell AWACS aircraft and other military equipment to the government of Saudi Arabia sets this controversy in a political, military, and diplomatic context. Nevertheless, the constitutional issues raised by § 36(b) are fundamentally similar in most respects to those raised by legislative vetoes attached to other grants of power. This Administration, like every previous administration since 1934, has taken the position that so-called legislative vetoes which impermissibly interfere with the power vested in the President by the Constitution are unconstitutional. We believe that the provision for congressional disapproval in § 36(b) is unconstitutional for two fundamental reasons.[1]

First, § 36(b) is unconstitutional under the Presentation Clauses of Article I, § 7, clauses 2 and 3 of the Constitution. These clauses require that all bills (clause 2) and other congressional actions having the force and effect of legislation (clause 3) must be presented to the President for approval. If the President approves such a measure, it becomes law; if he vetoes the measure by returning it with objections to its House of origin, it does not become a law unless two-thirds of each House votes to override the President's veto.

It is, we believe, incontrovertible that a resolution of disapproval under § 36(b) has the force and effect, even if not the traditional form, of legislation. The President is given statutory authority to negotiate

---

[1] The constitutional objections discussed in this memorandum have been articulated in considerably greater detail in testimony furnished to Congress by this Administration by Assistant Attorney General, Office of Legal Counsel, Theodore B. Olson on April 23, 1981, and October 7, 1981, to the Subcommittee on Agency Administration of the Senate Committee on the Judiciary and the Subcommittee on Rules of the House of the House Committee on Rules, respectively.

arms sales with, and make delivery to, foreign nations. Disapproval of a proposed sale under § 36(b) would nullify the President's exercise of that authority as applied to a particular sale. Any congressional action disapproving a proposed sale has the function, the force, and the effect of legislation, because it narrows the discretion which Congress has previously vested in the President by statute. Section 36(b), however, does not provide the President with the opportunity to approve or veto such congressional action, as required by the Presentation Clauses. In requiring only a concurrent resolution for disapproval of a proposed arms sale, § 36(b) unconstitutionally infringes on the power to veto legislation vested in the President by Article 1, § 7, clauses 2 and 3. *See* Chadha v. *Immigration and Naturalization Service*, 634 F.2d 408, 421–35 (9th Cir. 1980), *cert. granted and jurisdiction postponed*, 454 U.S. 812 (1981).*

Second, and equally fundamental, § 36(b) impermissibly intrudes on the President's authority to execute the laws and to conduct the Nation's foreign relations, in violation of the principle of separation of powers. Under our system of government, it is the function of Congress to legislate, as it has done in the present case by authorizing the President to negotiate and consummate military sales to foreign nations. It is equally the function of the Executive Branch to execute the laws which Congress has passed, as the President has done in the present case by negotiating the sale of AWACS aircraft and other military equipment to Saudi Arabia. Just as the President may not exercise the legislative power—for example, by taking actions outside the scope of statutory authorization or his inherent constitutional authority—so the Congress may not impermissibly intrude on the President's power to execute the law.

Section 36(b), however, purports to authorize Congress to act as a partner with the President in the statutorily authorized sale of arms to foreign nations. Not only is Congress a partner, but it is, in a sense, a superior of the President in this process, since the Congress has reserved to itself the purported authority to countermand an Executive Branch decision. While the separation of powers is not absolute or airtight, the type of arrogation of executive power contemplated by § 36(b) represents an impermissible intrusion on the constitutional prerogatives of the Executive Branch. *See Chadha*, 634 F.2d at 420–22.

The intrusion on executive prerogatives is particularly severe in the case of § 36(b) because of the special role of the President in conducting the Nation's foreign relations. While Congress has an important role to play in the foreign affairs context, as evidenced by the Senate's power to ratify treaties and the power of Congress to enact legislation bearing on foreign relations, it is the President who acts as the ultimate

---

*NOTE: The Supreme Court's opinion in *Chadha* v. *INS* is printed at 462 U.S. 919 (1983). Ed.

spokesman for the Nation in the world community. *See generally Dames & Moore* v. *Regan,* 453 U.S. 654 (1981); *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936). We do not suggest that the President's power to conduct foreign relations is so plenary as to disable the Congress from passing a statute—signed by the President or enacted over his veto—disapproving an arms sale. We do believe, however, that in his conduct of foreign relations the President must enjoy at least the full degree of discretion vested in him by legislation, without congressional interference with his performance of the delicate, and quintessentially executive, function of negotiating and consummating arms sales with foreign nations.

## C. Severability

In light of our concludion that § 36(b) is unconstitutional insofar as it authorizes the Congress to enact a concurrent resolution disapproving a sale of military equipment or services which the President intends to carry out, it is necessary to consider whether the invalid part of § 36(b) is severable from other portions of § 36(b) or of the Arms Export Control Act generally. If the provisions are not severable, the other statutory requirements or authorizations might fall with the legislative veto provision of § 36(b). *Cf. McCorkle* v. *United States,* 559 F.2d 1258, 1260 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011 (1978).

The question of severability is ultimately one of legislative intent. *Sloan* v. *Lemon,* 413 U.S. 825, 833–34 (1973). The legal standard is supplied by *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma,* 286 U.S. 210, 234 (1932): "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." This standard applies even in the absence of any express provision of severability. "The cardinal principle of statutory construction is to save and not to destroy." *Tilton* v. *Richardson,* 403 U.S. 672, 684 (1971) (quoting *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30 (1937)).

We have carefully examined the relevant legislative history and have concluded that the legislative veto device in § 36(b) is severable from the remainder of that section and from the Arms Export Control Act generally. The President's power to sell military equipment and services to foreign nations has for many years been an important aspect of U.S. foreign policy. Prior to 1974, such sales were not subject to congressional disapproval. Although the enactment of a congressional disapproval provision in 1974 did evidence a congressional intent to exercise greater oversight and control of the President's decisions in this area, we have found nothing in the legislative history of the 1974 legislation or of subsequent legislation re-enacting and amending § 36(b) to indicate that Congress, in the absence of a congressional veto provision,

would have deprived the President altogether of his power to transact foreign military sales. In light of the importance of foreign military sales to the conduct of the Nation's foreign relations, and in light of the alternative for guiding Executive Branch discretion available to Congress—most notably the "report-and-wait" provision also contained in § 36(b) [2]—we do not find the requisite evidence that Congress would have denied the President's authority to authorize foreign military sales were the legislative disapproval provision of § 36(b) held unconstitutional. For this reason, we conclude that the legislative veto provision of § 36(b) is severable from the other provisions of the legislation.

## II. Emergency Provision

Section 36(b) expressly contemplates that in emergency situations the President may transact a foreign military sale without submitting to congressional review. The section provides:

> The letter of offer shall not be issued if the Congress, within thirty calendar days after receiving such certification, adopts a concurrent resolution stating that it objects to the proposed sale, unless the President states in his certification that an emergency exists which requires such sale in the national security interests of the United States. If the President states in his certification that an emergency exists which requires the proposed sale in the national security interest of the United States, thus waiving the congressional review requirements of this subsection, he shall set forth in the certification a detailed justification for his determination, including a description of the emergency circumstances which necessitate the immediate issuance of the letter of offer and a discussion of the national security interests involved.

22 U.S.C. § 2776(b)(1). We understand that the President did not include a finding of a national security emergency in his certification transmitted to Congress on October 1. Thus, to trigger this provision, it would be necessary for the President to resubmit his certification supplemented by the emergency findings required by §36(b). The legislative history of the emergency provision does not provide clear guidance on what situations could be considered emergencies or whether the President's determination could be challenged in Congress or in court. It is our opinion, however, that

---

[2] We believe that the requirement in § 36(b) that the President report arms sales to the Congress and delay the transaction for a 30-day period pending congressional action to disapprove the sale through plenary legislation is constitutional During this 30-day period, or indeed until a letter of offer is actually issued, Congress could take action to prevent the sale by enactment of legislation subject to the approval or disapproval of the President under Article 1, § 7 of the Constitution.

the President enjoys virtually unlimited discretion to make an emergency determination, so long as he complies with the procedural requirements regarding including this determination in his certification and making detailed factual findings as specified. Once the President has made an emergency determination, it is our opinion that the sale could proceed immediately and could not be blocked by anything short of plenary legislation enacted by the Congress and signed by the President or passed over his veto. Moreover, we believe that the President's determination that an emergency exists for purposes of § 36(b) would not be reviewable in court. *Cf. Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106, 109 (2d Cir. 1966), *cert. denied,* 385 U.S. 898 (1966) (courts will not review the President's determination that a national emergency exists, because such a determination is "peculiarly within the province of the chief executive.").

While this avenue of avoiding the necessity to submit proposed sales for congressional review and potential disapproval is available to the President as a matter of law, there may be sound reasons of policy to avoid use of the emergency provision. The President did not make an emergency finding when he initially submitted that certification to Congress on October 1; it may be difficult to argue that there has been any change in circumstances other than the fact of congressional disapproval. Moreover, the argument that an emergency exists could be met by the objections that (a) even if approved, the AWACS aircraft cannot be delivered and made fully operational for a substantial period of time; (b) Saudi Arabia may be able to obtain similar aircraft from other western nations if the AWACS sale is disapproved; and (c) there appears to be no imminent threat to Saudi Arabia or U.S. security interests in the region which has not existed for some time. However, these are matters of policy as to which we can offer no authoritative or fully informed opinion.

### III. Consultation with Congress

The International Security and Development Cooperation Act of 1980, Pub. L. No. 96-533, § 47, 94 Stat. 3131, 3140, provides a third possible avenue for transacting the sale notwithstanding congressional disapproval. That statute provides, in pertinent part:

> The President may make sales, extend credit, and issue guarantees under the Arms Export Control Act, without regard to any provision of this Act, the Arms Export Control Act, any law relating to receipts and credits accruing to the United States and any Act authorizing or appropriating funds for use under the Arms Export Control Act, in furtherance of any of the purposes of such Act, where the President determines, and so notifies in writing the Speaker of the House of Representatives and

the chairman of the Committee on Foreign Relations of the Senate, that to do so is vital to the national security interests of the United States.

Before exercising the authority granted in this subsection, the President shall consult with, and shall provide a written policy justification to the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

Again, the President has not taken action to trigger this provision by providing written notification to the Speaker of the House of Representatives and the chairman of the Senate Foreign Relations Committee. The President would further have to "consult with" the specified congressional committee for an unstated period of time before the sale could be completed and would have to provide the required written policy justification. This section, we believe, rather clearly contemplates that the President, having taken these steps, could transact a foreign military sale notwithstanding any concurrent resolution of disapproval. It seems quite possible that the President could deem the required period of consultation with Congress to have been already fulfilled, or at least considerably foreshortened, by the extensive debates which have already occurred in the Congress on the arms package. Moreover, like the emergency provision of § 36(b), we believe that a presidential finding that a sale is vital to the national security interests of the United States would not be subject to judicial review.

This route may have certain advantages, as a matter of policy, over the emergency provision of § 36(b). While it may be rather difficult for the President to argue that an emergency exists now which did not exist on October 1, he might state with considerable justification that it has been the consistent, publicly held view of the Administration that the arms sale was vital to U.S. national security interests. Again, these considerations involve policy judgments as to which we are not able to offer authoritative or fully informed advice. That judgment can only be made by the President, in consultation with the Department of State and with other elements of the national security establishment.

## IV. Conclusion

In summary, we have identified three theories under which the President could proceed with the sale of AWACS aircraft and other military equipment to the government of Saudi Arabia. First, the President could, consistent with the longstanding position of the Executive Branch and with the express statements of his two immediate predecessors, choose to treat the congressional resolution of disapproval as a legal nullity because it violates principles of separation of powers as

embodied in the Presentation Clauses and in the executive function. Second, he could (if in his considered discretion such a judgment is possible) initiate procedures under the emergency exception to the congressional review provision of § 36(b). Third, he could initiate the consultation process contemplated by the International Security and Development Cooperation Act of 1980.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

317